Decided 11 June, rehearing denied 31 December, 1907.

## McLEOD v. DESPAIN.

90 Pac. 492, 92 Pac. 1088.

BILLS AND NOTES—EFFECT OF SIGNING AS "TRUSTEE."

1. The personal liability of the signer of a promissory note is not affected by the addition of the word "trustee," after his name.

NOTES—TRUSTEE—CIRCUMSTANCES AS NOTICE.

2. A person who learns of unusual circumstances connected with a transaction in which he is about to become interested, or of such facts as would put a person of ordinary prudence upon inquiry, as, that a note is payable to the payee, "trustee," or that a title is held by a person "trustee," is bound thereby to a knowledge of what could have been discovered by investigation.

EFFECT OF WORD "TRUSTEE" IN WRITING.

3. The appearance of the word "trustee," added to a payee's name in a note, or to a grantee's name in a deed or mortgage, or in connection with the name of a party to a written instrument, is sufficient to put persons dealing with such trustee upon inquiry, and, in the absence of inquiry, they will be presumed to have known what they might have discovered.

A landowner being heavily indebted at a high rate of interest, solicited a broker to procure the money on more advantageous terms, which he did by interesting several friends in varying amounts. The debtor then executed to the broker, "trustee" notes for the respective friends, and the notes were indorsed and guaranteed by the broker, "trustee." The original note and mortgage were assigned to the broker, "trustee," it being considered as the security for the series of notes made for the new lenders. *Held*, that the friends were put upon inquiry as to the conditions of the transaction, and were bound to know all that they might have discovered about the payments of the borrower and what was being done with the money, since the appearance of the word "trustee" implied that the broker was not acting for himself.

AGENCY—LIMITATION OF RIGHT OF RATIFICATION.

4. The right of a principal to ratify unauthorized acts of his agent is subject to the limitation that he must ratify the act entirely or disaffirm it—he cannot accept the benefits and repudiate the obligations.

Where an agent held possession of the security for a series of notes owned by different persons, and received for them both interest and partial payments, they cannot recognize his authority for the purpose of such collections as they received and deny it as to other payments which he retained and converted.

AGENCY—DUTY TO TRACE APPLICATION OF PAYMENT.

5. One who pays his obligation to an agent of the payee having the evidence of the debt in his possession is not under obligation to see that the payment reaches the creditor, though that may not be the case where the payment is made to the payee after he has sold and delivered the obligation and does not produce it when payment is tendered: *Bamberger v. Geiser*, 24 Or. 307, distinguished.

AGENCY—TERMINATION OF BY INSOLVENCY.

6. An agency may be presumed to continue until it is shown to have been terminated, but it will cease without any definite act of the principal upon the general knowledge of his insolvency.

AGENCY—CASE UNDER CONSIDERATION.

7. Defendants, who had had a debt of $28,000 evidenced by a note secured by mortgages, applied to W. to furnish money to pay the indebtedness and take an assignment of the note and mortgages. W. secured the money from plaintiff and others, and assigned to them notes made by the defendant and payable to him as trustee and secured by the original note and mortgages. He held the original notes and security and all the other notes except those of plaintiff and S. He received payments sufficient to pay all the notes, but did not credit them on the notes of plaintiff and S., or pay the money to them. He continued under the trust without his right being questioned until he became insolvent. *Held,* that W. was the agent of plaintiff and S., with full authority to collect the sums represented by the notes, and so collected the money which was paid to him in trust for their benefit with their full knowledge and assent, and that, sufficient having been paid to him in that capacity to cancel the principal and interest of all the notes given, they, together with the mortgages, should be canceled.

EVIDENCE—CONTEMPORANEOUSNESS NOT DETERMINED BY DATES.

8. Papers relating to a stated transaction are all to be considered together, and the dates are not controlling.

VALIDITY OF GUARANTEE BY AGENT TO PRINCIPAL.

9. An agent may lawfully guarantee to his principal the payment of obligations that he has taken in the course of his agency proceedings.

PRINCIPAL AND AGENT—RIGHT OF RATIFICATION.

10. The principal must adopt or reject the unauthorized acts of his agent as an entirety.

EXECUTED CONTRACTS—STATUTE OF FRAUDS.

11. Agreements either oral, or partly written, are binding on the parties and not subject to the statute of frauds, after being executed.

BOOKS OF TRUSTEE AS EVIDENCE.

12. The books of account kept by a trustee are admissible against his principal to show admissions against interest, as, the amounts of money received for the benefit of his principal, and also to show disbursements made within the scope of his authority.

TRUSTEE—ILLUSTRATION OF IMPROPER DISBURSEMENT.

13. An agent having authority to collect a large note accepted a farm for a stated amount and entered it as cash in his agency account, after which he loaned it without authority to the debtors. *Held,* that the debtors are entitled to credit for the amount paid, the question of its disbursement being entirely between the agent and his principal.

From Umatilla: WILLIAM R. ELLIS, Judge.

Statement by Mr. COMMISSIONER KING.

This is a suit in equity by J. S. McLeod to foreclose three mortgages executed by Nancy E. Despain, Florence L. Berkeley, Bernice C. Dickson, Albert M. Despain, Edith Geraldine (Despain) Berkeley, together with Louise B. Despain, Eleanor M. Despain and Constance A. Despain, minors, by their guard-

ian, Nancy E. Despain, who with Norborne Berkeley, H. Dickson and Chas. C. Berkeley, constitute the appellants herein. These mortgages were given to J. N. Teal to secure a note for $28,000, dated March 28, 1898, payable five years after date, with interest at the rate of 8 per cent per annum, and, together with the note, were assigned to C. B. Wade, trustee, to secure certain other notes thereafter executed to him as such trustee, · one of which was assigned to plaintiff, McLeod, and one to Lina H. Sturgis, who constitute the respondents herein. The remainder of the notes so executed were indorsed by Wade to other persons not parties to this suit. Lina H. Sturgis was made a party defendant and answered, asserting her claim in the mortgage to the extent of her interest therein, as evidenced by her note. Wade was made a nominal party defendant; but not having been served with summons, made no appearance. Various other persons, not involved here, were also made defendants on account of interests claimed by them in the after-acquired mortgaged property. McLeod demands a decree foreclosing the mortgages to satisfy the sum of $7,000, with unpaid interest, while Sturgis prays a decree of foreclosure for an alleged unpaid balance of $1,157.45, with interest. Appellants, by their answer, allege that all the notes and mortgages were paid in full to Wade as agent and trustee of respondents, and ask a decree dismissing the suit, together with affirmative relief to the effect that all the notes referred to be declared paid and the mortgages canceled of record. A trial was had before the court, resulting in a decree in favor of the respondents, as prayed for, from which decree this appeal is taken.                    REVERSED.

For appellants there was a brief with oral arguments by *Mr. Charles Harrison Carter, Mr. Wirt Minor* and *Mr. Thomas Griffin Hailey.*

For respondent McLeod there was a brief over the name of *McCourt & Phelps,* with an oral argument by *Mr. John McCourt.*

For respondent Sturgis there was a brief and an oral argument by *Mr. James A. Fee.*

Opinion by Mr. Commissioner King.

The facts leading up to this suit, as we gather them from the record, are substantially as follows: In March, 1898, appellants borrowed $28,000 from J. N. Teal, of Portland, Oregon, executing their promissory note therefor, payable to his order five years after its date at the Pendleton Savings Bank, Pendleton, Oregon, with interest at the rate of 8 per cent per annum. To secure the payment of this note, three mortgages were also executed and duly recorded, covering certain lands in Umatilla County, Oregon. In June of the same year, appellants, desiring to reduce the rate of interest and in order to sell their lands and apply the proceeds upon the indebtedness, wanted the privilege of paying the principal and interest before due, and, as Teal would not accede to these terms, but was willing to receive the full amount at any time, they made application for a loan to C. B. Wade, then cashier of the First National Bank, of Pendleton, Oregon. Norborne Berkeley testified that, as their agent, he made the application, and that the first time he spoke to Wade concerning the loan he answered: "We haven't got the money now, but can probably let you have it later"; that during the same week he renewed the request, and Wade replied: "I think we can get the money now, and will let you have it." After talking the matter over, he told Wade that, if he would buy the Teal note and hold it and allow them to pay it off in such sums as they could, it would suit them bettter than as it was, since they wanted to sell certain ranches and apply the proceeds on their obligation. Wade was to give them a lower rate of interest, and for his services in the transaction would charge $1,500, all of which was agreed to; and after learning that Wade had received the note and mortgages from Teal appellants executed eight promissory notes, made payable to "C. B. Wade, trustee," dated June 29, 1898, with interest at the rate of 7 per cent per annum, payable semiannually, "on or before five years from date." The notes aggregated $29,500, as follows: Two for $7,000 each, and two for $2,500, two for $1,500, one for $3,500, and one for $4,000. One of the $1,500-notes

represented the bonus to Wade. All the signatures of the new notes were procured within a short time after Wade received the Teal note and mortgages duly assigned. The new notes were accordingly turned over to him, and, with the exception of the bonus note, were duly assigned to the parties advancing the money.

As a part of the transaction, appellants and Wade entered into an agreement concerning the payment and disbursement of rents to be received on the property, which on June 30, 1898, was reduced to writing, and, omitting the signatures, is as follows:

"This Agreement, made and entered into this 30th day of June, 1898, by and between N. E. Despain, Florence L. Berkeley and Norborne Berkeley, Jr., her husband, Bernice Dickson, and Haldane Dickson, her husband, Albert M. Despain, Edith G. Despain, and N. E. Despain as guardian of the persons and estates of Louis B. Despain, Eleanor Despain and Constance A. Despain, minors, parties of the first part, and C. B. Wade, trustee, party of the second part, Witnesseth:

That, Whereas, the first parties have borrowed of C. B. Wade, trustee, party of the second part, twenty-eight thousand dollars ($28,000), payable on or before five years, and bearing interest at the rate of seven per cent per annum, said loan being secured by a note and mortgage for $28,000, which note is secured by a real estate mortgage on certain city property in the City of Pendleton, and farm lands in Umatilla County, Oregon, same having been duly executed and delivered to J. N. Teal, of Portland, Oregon, by said first parties, and by said J. N. Teal duly assigned to second party hereunto;

Therefore, in Consideration of the Premises, and for the further security of said C. B. Wade, trustee, said first parties hereto do sell, transfer, set over and assign to C. B. Wade, trustee, all the rents and profits of the property in the City of Pendleton, described in said mortgage from said first parties to J. N. Teal, for the period of five years, unless said sum of twenty-eight thousand dollars ($28,000), and interest thereon, shall have been sooner paid to said second party.

First Parties do Further Agree that they will, without expense to said second party, collect and deposit in the First National Bank of Pendleton, Oregon, to the credit of the second party, the rents and profits of mortgaged property within limits of the City of Pendleton.

And Said Second Party Agrees (1) that of moneys so deposited by said first parties, if same be sufficient therefor, he will pay or cause to be paid to N. E. Despain, the sum of one hundred fifty dollars ($150) per month; (2) that he will pay interest on said loan semiannually; (3) that he will pay premiums on such fire insurance policies as may be procured, subject to approval of second party, by said first parties on property in City of Pendleton material to this agreement; and (4) that if, after such payments as hereinbefore set forth are paid, there remains any balance of such rents and profits, the same shall be paid on principal of said loan of twenty-eight thousand dollars ($28,000) ; provided, however, that if first parties shall be unable to pay taxes assessed against said property the party of first part may pay such taxes from such balance, if any there be."

It appears that after receiving the application Wade spoke to McLeod, Sturgis and others concerning it, explaining the time, terms and conditions desired, and suggested that they advance the necessary money, indicating it would be a safe investment, for the reason he would procure an assignment of the note and mortgages from Teal to himself, as trustee; and, as an additional safeguard, he would arrange to have all rents from the property, together with receipts of sales of lands, if sold, paid to him during the period of the loan, which he would apply in payment of the interest, when due, and credit the excess upon the principal. With this understanding McLeod furnished $7,000, Lina H. Sturgis a like sum, while the balance of the funds was advanced by other parties not involved here. The money advanced, being sufficient for the desired purpose, amounting to $28,000, was paid over to Wade, who, with full knowledge, consent and request of all concerned, paid the same to Teal. The assignment was in the usual form, dated June 29, 1898, and executed to "C. B. Wade, trustee"; the note being indorsed, "without recourse to J. N. Teal."

The new notes were given for the purpose of indicating and specifying in writing the terms of payment of the obligation represented by the Teal note and mortgages, as well as to indicate the interest each of the parties advancing the money might have in the entire indebtedness and mortgage security, includ-

ing the additional $1,500 bonus note given. These notes were executed, assigned and accepted with the full knowledge and understanding of all the parties concerned that Wade, as trustee, was to hold the Teal note and mortgages, and neither the note nor mortgages should be deemed discharged until the amounts specified in the new notes should be fully paid. Wade accordingly entered upon his trust, retained possession of the Teal note and mortgages, received all rents and other proceeds from time to time, and, after paying the amounts excepted under the contract, credited the excess on the new notes until the $29,500, with interest, was paid, except the sums involved in this suit, all of which were paid to him to apply on the notes; but the money for which a decree is here demanded was neither credited thereon nor paid to the respondents. He so continued under the trust, without his right to do so being questioned, until September 8, 1903, when he became insolvent. After the execution of the new notes they were indorsed by Wade to the various persons entitled thereto. McLeod retained his note in his possession, while the Sturgis note was held by Hartman as her agent; but all credits on these notes were placed there by Wade, who was given the notes by the holders for that purpose as the money was paid to them.

Prior to the date Wade's insolvency became known, tracts of the mortgaged land were sold from time to time, and releases duly executed by Wade, as trustee, and the moneys received therefor in accordance with the understanding and agreement between the parties concerned. During all this time and for many years prior thereto, Wade was cashier of the First National Bank of Pendleton, Oregon, and plaintiff, McLeod, was a director and stockholder only. The money was deposited in this bank as received, and entered on its books under the account of "Wade-Despain Trust." As payments were made to the holders of the notes, checks were given by Wade, signed "Wade-Despain Trust." Like checks were given for all other disbursements made by him under the written agreement. In this manner Wade kept a memorandum of moneys reecived and paid on the notes, as

well as of all disbursements under the contract. When the notes were assigned to McLeod and Sturgis, Wade guaranteed the payment thereof in the following language, indorsed on the back of each note:

"This note is secured by a note of $28,000, signed by the same parties, which is secured by real estate mortgages assigned to C. B. Wade, trustee. For value received I hereby guarantee payment of this note and waive protest, demand, notice of non-payment thereof.                         C. B. Wade, Trustee."

It is urged by counsel for respondents that during the entire transaction, and until his insolvency, Wade was the agent only of appellants, and that respondents are *bona fide* purchasers of the new notes, and that, by operation of law, these notes carry with them the Teal mortgages; that the new notes were intended to be substituted for the old, and by oral agreement these mortgages were to secure their payment; that this oral agreement is supplemented by the statement indorsed on the new notes given: "This note is secured by a note of $28,000, signed by the same parties, which is secured by real estate mortgages assigned to C. B. Wade, trustee." Appellants' counsel insist that Wade was only respondents' trustee and agent, and that, sufficient money having been paid him to cover the entire claim growing out of the deal, they were released from any further obligations. It appears that appellants' object in procuring the money with which to take up the Teal note and mortgages was for the purpose, first, of reducing the rate of interest from 8 per cent per annum to 7 per cent; second, to secure the privilege of paying the principal and interest at any time and in order that the realty could be sold and mortgages released as sales were made, thereby enabling the indebtedness to be extinguished as soon as practicable. To accomplish these objects they were willing to pay a $1,500 bonus, and were not only willing to pay this additional sum, but consented to and did enter into the agreement whereby all the rents and proceeds from sales should be paid to the holder of the mortgage security. With notice of these conditions, consisting of both actual and constructive knowledge, respondents advanced the money with which to

purchase the Teal note and mortgages, and, as a means of segregating and evidencing the respective interests therein of each of the several persons advancing the money, as well as to show a change in the terms of payment and rate of interest, the new notes were given. The transaction was, in effect, the same as if all the new terms and conditions of payment were indorsed on the old note and mortgage, the difference being, under the method adopted, that each person, if desired, might hold the written· instrument evidencing his or her interest, while leaving the security in Wade's possession, thereby making it more convenient for all, in that Wade could act as agent and trustee for each party represented. In this way the sales were to be facilitated as well as the payment of the indebtedness insured, and thereby carry into effect one of the main objects in changing creditors. It is clearly apparent that the new notes were given and the negotiations perfected in this manner, and with this object in view. As evidence that there should be but the one debt and that neither the Teal note nor mortgages should be deemed paid or canceled, all were assigned to Wade as trustee; and to make certain that the note and mortgages should be kept alive, this fact was stamped on the back of the new notes as executed.

1. For the purpose of assuring the payment of the $1,500 promised him, Wade not only consented to act as trustee for the holders of the notes, but was willing to guarantee payment of the notes held by respondents, and accordingly indorsed the notes as guarantor, and, as such indorser, was personally bound, notwithstanding the fact that the word "trustee" was added to his name: *Ogden Railway Co.* v. *Wright,* 31 Or. 150 (49 Pac. 975).

The date of the written agreement executed to Wade, as trustee, by appellants is immaterial, as the transaction must be considered as a whole, even though it consumed more than one day. While there is no direct testimony that Sturgis had actual knowledge of such understanding, it does appear that McLeod relied upon an agreement to that effect. On this point McLeod testified:

"Q. Did he (Wade) tell you anything about having these other notes further secured by having the city rents turned over to him?

A. I asked him (Wade) how he was to pay the interest on these notes. He said the rents was to come to him, and if any of the property was sold they would apply it on these notes. That is the reason he gave on or before five years after date so that they could have a chance to sell it.

Q. He also told you he would have these rents assigned to him to apply on the notes?

A. He said he could pay the interest because he was getting the rents.

Q. They hadn't been going to him prior to that time, had they?

A. I don't know.

Q. As I understood you on direct examination, you said Mr. Wade told you he was collecting the rents; are you entirely correct in that?

A. Yes, sir; he said he was getting their rents.

Q. Didn't he tell you he would have these rents turned over to him so they could be applied on the interest?

A. Yes, sir; that is what he said, he was getting the rents.

Q. On his explanation to you of how this $28.000 note was assigned to him and held as security for the payment of the amount due on these others, you felt it was safe and you put up your money?

A. I thought so or I would not have done it."

Mr. Hartman, the agent of Sturgis, testified:

"Q. He (Wade) was to hold that $28,000 note and mortgage to secure the payment of this?

A. Yes, sir.

Q. That was the agreement at the time?

A. Yes, sir; to be assigned by Despain and secured by this $28,000 mortgage.

Q. Wade was to hold it as trustee?

A. He was to hold it as security for this note.

Q. Do you know whether or not Mr. Wade collected the rents from this property?

A. I so understood it."

This testimony, taken together with the fact which is testified to by both McLeod and Hartman, that all the interest and moneys paid and credited on the notes came through Wade's hands and were indorsed thereon by him; that appellants' property was sold from time to time, and the mortgages released, with the full knowledge of both McLeod and the agent of Sturgis, and that all money received on the notes came from such sales and rents; that such sales were made and releases executed without objection on their part, and apparently with their approval, they receiving their portions of the money as applied in payment of interest, etc.,—all furnish strong evidence tending to show full knowledge and notice of all the conditions and terms under which the notes were executed.

2. But, if it be assumed, as contended by respondents' counsel, that the new notes were executed with the object of thereafter being indorsed and sold by Wade for the purpose of raising the money with which to take up the Teal note and mortgage, it must then be conceded that, for the purpose of making this sale and applying the proceeds as agreed, Wade for the time being was the agent of the Despains, and, in that respect, their trustee, and continued as such until the consummation of the sale of the notes and application of the proceeds as directed. It would then follow that the word "trustee" was added that it might be known there was a *cestui que trust*, and that conditions were to be performed by the trustee for the beneficiaries. Then would not this word attached to the payee's name impart notice, or at least be sufficient to put the purchaser upon inquiry, as to the terms and conditions under which the trust was created? In *Wills* v. *Wilson*, 3 Or. 310, the court states the rule to be that, "when the circumstances are such as would excite suspicion and naturally attract the attention, a party will be presumed to have been put upon inquiry, and if he does not inquire he will be presumed to have known the facts." To the same effect are *Mercantile Nat. Bank* v. *Parsons*, 54 Minn. 56 (55 N. W. 825: 40 Am. St. Rep. 299), and *Shaw* v. *Spencer*, 100 Mass. 382 (97 Am. Dec. 107: 1 Am. Rep. 115). In the

case at bar respondents concede that they entered into a combination with several other parties to furnish the money with which to take up the $28,000 note and mortgages securing it. It clearly appears from the evidence that in order to do so safely and satisfactorily to all concerned many conditions were involved. The old note with mortgages securing it were to be assigned to Wade as trustee, to be held to secure the assignees of the new notes which were to be given. He was to receive notes, specifying the various interests of each, with new terms included, and assign them to the various parties advancing the money, as their interest would appear. All the money so furnished was to pass through Wade's hands. In brief, Wade was to be the "go-between" for all parties until the transaction was completed. He became agent for Teal in holding the note and mortgages until the money was paid, and, under respondents' contention, agent for appellants in procuring the funds to pay Teal, as well as agent for respondents to invest their money. These circumstances, taken together with the word "trustee" added to his name in the notes, were certainly sufficient to attract attention and cause an average business man to closely scrutinize all the terms and conditions under which the entire deal was consummated.

In *Shaw* v. *Spencer,* 100 Mass. 382 (97 Am. Dec. 107: 1 Am. Rep. 115), Mr. Justice Foster, in discussing this question, says: "Notice of the existence of a trust is by all the authorities held to impose the duty of inquiry as to its character and limitations. And whatever is sufficient to put a person of ordinary prudence upon inquiry is constructive notice of everything to which that inquiry might have led." Among authorities to the same effect are: Randolph, Com. P. (1 ed.), § 444; Daniel, Neg. Inst. (5 ed.), § 271; *Prather* v. *Weissiger,* 10 Bush (Ky.), 117; *Gaston* v. *American Exch. Nat. Bank,* 29 N. J. Eq. 98; *Duncan* v. *Jaudon,* 82 U. S. (15 Wall.) 165, 175 (21 L. Ed. 142); *Railroad Co.* v. *Durant,* 95 U. S. 576, 577 (24 L. Ed. 391); *National Bank* v. *Insurance Co.* 104 U. S. 54 (26 L. Ed. 693); 34 Cent. L. J. 45; *Smith* v. *Burgess,* 133 Mass. 511; *Third Nat. Bank* v.

*Lange,* 51 Md. 138 (34 Am. Rep. 304). A few states appear to hold to the contrary rule. Indiana and Missouri are cited as holding that words of this nature affixed to the name of a payee are merely *descriptio personae: Speelman* v. *Culbertson,* 15 Ind. 441; *Powell* v. *Morrison,* 35 Mo. 244. The consideration and criticism of these cases by subsequent decisions weaken them as precedents. In *Speelman* v. *Culbertson,* the words, "administrators of the estate of John Babcock, deceased," appeared after the names of the payees; while in *Powell* v. *Morrison,* the note was payable to one "James Castello, Sheriff of St. Louis County." The court in announcing the opinion manifests much doubt as to the correctness of its position, while one of their number dissents.

In discussing this question in *Payne* v. *First Nat. Bank,* 43 Mo. App. 377, Mr. Justice Biggs, speaking for the court, says: "There is a class of cases in this state which hold that a note, payable to a person as executor, guardian, agent or sheriff, is *prima facie* the payee's individual property; that the words 'executor,' 'guardian,' etc., are merely *descriptio personae;* and that such words are not sufficient within themselves to put a purchaser of such a note on inquiry as to conditions or limitations (if any) of the payee's power to pledge or sell, * * citing authorities of that state. The doctrine of the foregoing cases has for its foundation the reason that, in the execution of such trusts, the law contemplates that it will be necessary to collect or sell the trust property. Upon this reason the *prima facie* right of such payee to make any kind of disposition of the note is predicated. But, in our opinion, these cases are not applicable when the negotiation of instruments, or the sale of other property held by a trustee, is involved, and the instrument upon its face discloses the beneficial interest of another." This authority, after quoting with approval from *Shaw* v. *Spencer,* 100 Mass. 382 (97 Am. Dec. 107: 1 Am. Rep. 115), and *Duncan* v. *Jaudon,* 82 U. S. (15 Wall.) 165 (21 L. Ed. 142), adds: "These authorities are sufficient to show that the powers of a trustee as to the disposition of the trust property are quite the

reverse of those of an executor, guardian or sheriff. * *" The appellate court of Missouri in *Sparrow* v. *State Exch. Bank*, 103 Mo. App. 347 (77 S. W. 170), also observes: "It must be confessed that the rule declared by the Supreme Court of the United States in *National Bank* v. *Insurance Co.* 104 U. S. 54 (26 L. Ed. 693), and the cases in which it has been followed by that court, cannot be reconciled with that declared in the Missouri cases already alluded to. If the question here had not been authoritatively ruled by our own supreme court, we should be inclined to adopt that declared by the Supreme Court of the United States, since the reasoning in those cases by that great court in favor of the rule therein announced, it seems, are of the most cogent and persuasive nature."

3. We find on examination of the cases sustaining respondents' contention on this point that most of the authorities upholding that view manifest some doubt as to the soundness of their position. This point has not heretofore been directly before this court; but we find the great weight of authority, as well as the better reasoning, supports the rule that the word "trustee," added to a payee's name in a written instrument, is sufficient to put the purchaser upon inquiry as to all the terms and conditions under which it may have been executed, and in the absence of such inquiry knowledge thereof will be presumed. We also deem a recognition of this rule necessary to properly protect the beneficiaries of such trusts; otherwise, under the claim of being a *bona fide* purchaser, through the neglect of the assignee of an instrument to make inquiry, the *cestuis que trustent* in many instances would, without fault on their part, suffer great loss. The adoption of the rule here recognized protects the innocent without hardship to investors; while the contrary doctrine offers an inducement to purchasers of this kind of property to neglect making inquiry as to the import of the word "trustee," by which the innocent must often suffer at the hands of dishonest trustees in whose selection it often happens the beneficiary has no voice.

When considered in the light of the many circumstances surrounding the transactions leading up to this suit, we cannot

avoid the conclusion that, if the notes were purchased in the manner claimed, having received the assignment of the notes made payable to the order of Wade, as trustee, they had full knowledge of all the agreements, oral or written, connected therewith. Even though Wade was a trustee for the appellants in disposing of the notes until the completion of all the arrangements, as urged, as well as agent for respondents to the extent of furnishing the "gilt edge paper" referred to, and in securing the assignment of the Teal note and mortgages to him for the benefit of the assignees of the new notes, yet such agency for defendants, though presumed to have continued until shown to have ceased, necessarily ended the moment the transaction became complete. On the completion of the deal the makers of the notes, by agreement, were absolutely bound to pay to Wade, as trustee, all rents received, as well as all proceeds resulting from the sale of the property. There was no discretion left for them to do otherwise. Unlike that of a principal and agent, they were not at liberty to disregard Wade's demands, whether the various agreements were oral or written, as the understanding between all concerned had been acted upon, Wade having entered upon the duties devolved upon him by the trust. The notes had been sold, mortgages assigned, and money advanced and paid as directed, of all which each of the parties thereto, whether obligors or obligees, had either actual or constructive knowledge. Wade thereby became fully recognized by respondents, not only by operation of law, but, in fact, as their trustee, to see that all the terms and conditions of the trust were carried out.

To insist that after the entire transaction was completed Wade was agent or trustee of appellants would be inconsistent with every principle governing business dealings between men, as this would make the mortgagors, through Wade as their agent, the holders of the securities given by them with an agreement to pay all proceeds of rents and sales over to themselves. Respondents would have been retaining the notes, and at the same time intrusting the mortgage securities to the pos-

session of the persons executing them. The record shows all persons interested to have at least good average business ability, which, when considered with the other facts, impels us to the conclusion that when the transaction became complete Wade became the trustee solely for the assignees of the notes, not only as claimed by respondents' counsel and, as evidently held by the learned court below, "merely as a receptacle or custodian raised by implication of law for the preservation of the mortgage security," but a trustee in the full sense of the word, with full authority to act for and in their behalf in the protection of their interests, including the authority to receive all payments to be applied on the notes until paid in full. In this connection it must be remembered that respondents were stockholders in the bank, while McLeod was a director. Wade had been for many years, and was then, the cashier. The notes presumably were all in his possession, except the two involved here, and all made payable. not only to him as trustee, but at the bank of which he was cashier. All money applied in the payment of interest and cancellation of any notes given in the transaction was paid to Wade at this bank. Except as to the amounts sued upon, the notes were always taken to Wade when each payment was made on the interest or principal, and was by him indorsed on the notes. The Teal note and mortgages, as well as all the notes, except those assigned to McLeod and Sturgis, were there held by him and in his possession. Mortgages were released which, with all payments made through him, were known, recognized and acquiesced in by all concerned. Every act not only tended to give notice to the creditors of the existing conditions under which the trust was executed, but to impress more strongly on the debtors the fact that their agreements were recognized and that their payments were being made to the right person. That it was a case of misplaced confidence on both sides is self-evident. It is one of the numerous cases where one of two innocent persons must suffer because of the betrayal of a trust reposed in a third, and where the person most at fault must bear the loss: Story, Agency (9 ed.), § 127;

*Bamberger* v. *Geiser,* 24 Or. 207 (33 Pac. 609) ; *Kasson* v. *Noltner,* 43 Wis. 646.

4. In view of the facts and conditions stated, as gathered from the evidence, it conclusively appears that respondents were most at fault. For the purpose of bringing this suit they recognized Wade as their trustee, and one of the most unequivocal methods of showing a ratification of an agent's authority is the bringing of a suit based upon the agent's acts. They appear to recognize his authority where to their advantage, and to disclaim his acts where to their injury. It being to their advantage, he is recognized as the holder and trustee for the purpose of holding the Teal note and mortgage. The old note is recognized as having sufficient life to bridge the chasm between the mortgages and the new notes, but extinguished for any other purpose. Wade's authority is recognized as to moneys paid to him and credited on the notes, by reason of which the amounts so received are retained, but rejected as to the loss occasioned by his other receipts. It is elementary that this position cannot be upheld or recognized by a court of equity. When a principal elects to ratify any portion of an unauthorized act, he must ratify the whole of it. He cannot avail himself of such acts so far as beneficial to him, and repudiate its obligations whether such ratification be expressed or implied: Mechem, Agency, §§ 128, 130, 151; *LaGrande Nat. Bank* v. *Blum,* 27 Or. 215 (41 Pac. 659) ; *Noble* v. *Nugent,* 89 Ill. 522; *Hovey* v. *Blanchard,* 13 N. H. 145; *Kasson* v. *Noltner,* 43 Wis. 646.

5. It is contended, under the rule announced in *Bamberger* v. *Geiser,* 24 Or. 207 (33 Pac. 609), that it was the appellants' duty, when paying the money to Wade, to see that it was properly applied in the discharge of the indebtedness, and the court below must have so assumed in reaching the conclusion manifested by its decree. But the decision in the case referred to it not applicable to the facts governing the controversy before us. In that case the assignee not only received the note by assignment, but the mortgage was delivered into his possession and retained by him, while the money was paid to the first

mortgagees without any evidence of their right to receive it, and without even apparent authority to do so. In this case Wade, as trustee for the payee, retained possession of both the original note and mortgages, together with all other contracts, notes and writings, except the two new notes involved here, constituting the evidence of the terms, conditions and rate of interest under which the makers had the privilege of paying the portion of the original indebtedness owed by them, with the word "trustee" included, thereby imparting notice of the understanding and agreement that the amounts there ·specified could be paid to Wade as trustee. It, therefore, cannot be held, nor did this court in *Bamberger* v. *Geiser* hold, or mean to hold, that under such circumstances the persons making the payments were bound to see that the money was properly applied.

The principle here invoked was recognized in *Swegle* v. *Wells,* 7 Or. 222. There the defendants made application to Shaw & Henton, money brokers, for a loan, offering to secure the same by a real mortgage. They did not have the money, but reported the application to Swegle, who agreed to make the loan. It was agreed that the loan would be made in Henton's name, and the note made payable to him or bearer. A note and mortgage were executed accordingly, and the money paid into the hands of Shaw & Henton, who delivered it to the applicants. The note was then turned over to plaintiff, and while in his hands, before due, its maker paid the full amount therein to Shaw & Henton at their office. The defense raised was to the effect that the money was paid to plaintiff's agents, who were authorized to receive it, thereby canceling the note; while plaintiff there contended that Shaw & Henton were not his agents, and were without authority to collect the money, and that it was the duty of the defendant to have seen that the money was properly applied. Although a suit in equity was brought to foreclose the mortgage securing the note, the case was tried before a jury. This court there held that while the verdict of the jury was only advisory to the chancellor, not conclusive, and might be treated as a mere nullity if not supported by the evi-

dence, yet, there having been evidence to the effect that Shaw & Henton were in the real estate and brokerage business, and had been intrusted with the authority to make the loan, as well as with the authority to perfect the transaction and take the note payable to Henton, or bearer, notwithstanding the plaintiff was the lawful owner and holder of the note for value before due, with the note in his possession, the evidence was sufficient to show authority in Shaw & Henton to collect the amount named in the note, and the verdict of the jury would not be disturbed, and equitable relief was accordingly denied. To the same effect see 2 Kent, 613; *Wardrop v. Dunlop,* 1 Hun, 325; *Williams v. Walker,* 2 Sandford's Ch. 325; *Hatfield v. Reynolds,* 34 Barb. 612; *Lazier v. Horan,* 55 Iowa, 75 (7 N. W. 457: 39 Am. Rep. 167); *Palo Alto B. & I. Co. v. Mahar,* 65 Iowa, 75 (21 N. W. 187); *Thomassen v. Van Wyngaarden,* 65 Iowa, 687 (22 N. W. 927); *Kasson v. Noltner,* 43 Wis. 646.

6. Wade's authority to represent respondents, whether expressed or implied, did not cease until after his insolvency became known, and not until after all payments appearing in the evidence were made; he during all this time retaining the securities which the payments were intended to cancel. In *Hatfield v. Reynolds,* 34 Barb. 612, one Purdy, an attorney for Hatfield, made a loan for him to Reynolds. Purdy retained the security in possession for safekeeping, received the interest regularly, and finally the principal was paid to him. Purdy died insolvent without accounting to Hatfield. The lower court there held that such bond and mortgage were left with Purdy only for safekeeping, and not for the purpose of collecting either principal or interest; and, he having acted without authority, defendant was liable. On appeal, this decision was reversed, the court holding that, as plaintiff left the bond and mortgage with Purdy for safekeeping, and evidently permitted it to remain for other purposes, allowed payments to be made upon it to Purdy, received the amount of. these payments from him and suffered him to indorse them upon the bond, it would be deemed from these facts, coupled with the circumstances attending the

origin of the bond and mortgage, that authority to Purdy to receive payments was implied, and observes: "I do not perceive that if the defendant had taken the precaution to call for the production of the papers whenever he made a payment, he would have strengthened this implication. The authority is implied from the possession of the papers and the continued receipt of money upon them, which are facts, and not from the exhibition of the papers by the agent, which is only the evidence of the facts. * * To have called for the bond and mortgage under the circumstances of this case, would have been a very prudent and proper precaution, but it would have been only a precaution. It would have enabled the defendant to verify the authority of Purdy, but it would have been no more than verifying it."

7. After a careful consideration of the evidence, as disclosed by the record and law applicable thereto, we can reach no other conclusion than that Wade was the agent of respondents with full authority to collect the sums represented by the notes given, and so collected the money which was paid to him in trust for the benefit of respondents with their full knowledge and assent; and that sufficient having been paid to him in that capacity to cancel the principal and interest of all the notes given, they, together with the mortgages, should be canceled. The prayer of the answers to that effect should, therefore, be granted.

The decree of the court below should be reversed, and one entered here in accordance with these views.        REVERSED.

---

Decided 31 December, 1907.

ON MOTION FOR REHEARING.

Opinion by MR. COMMISSIONER KING.

8. Respondents, in their petition for rehearing, contend that we were in error in the statement in our former opinion to the effect that the signatures to the eight promissory notes, made payable to the order of C. B. Wade, trustee, were procured, and notes delivered, after he received the Teal note and mortgages duly assigned to him. It is true that the assignment of the

Teal instruments, as well as of the new notes, are dated June 29, 1898, and the written agreement between Wade and appellants is dated the day following; and, while the $28,000 draft may have been forwarded to Teal by the Pendleton Savings Bank on July 1st, the money was actually paid to the bank for that purpose, and assignment of note and mortgages recorded, June 30, 1898. It is evident that respondents' counsel make no distinction between the dates as they appear on the instruments in evidence and the actual time when the various steps were taken, and that they overlook the governing feature that the various transactions, although requiring several days for completion, must be considered as a whole.

On these points various facts and circumstances sustain the conclusion heretofore reached, an instance of which we quote from the testimony of Norborne Berkeley as follows:

"Q. At the time this transaction was made, in what capacity, if any, were you acting for Mrs. Despain and the other defendants?

A. I was acting as their agent in handling the affairs of the Despain estate.

Q. Tell the court how it occurred.

A. We owed Mr. Teal, or rather Mr. D. P. Thompson, I think, by a note made to J. N. Teal, $28,000. I thought there was an understanding we could pay part of it off, and I wrote to Teal and asked if we could sell a ranch and apply the money, and he said, 'No.' I thought that possibly we might get the money somewhere else, and I went to Mr. Wade. The first time I asked him if he could let us have $28,000, he said: 'No, we haven't got the money now, but can probably let you have it later.' And, probably during the same week, I went back to ask him about it, and he said: 'Yes, I think we can get the money now, and will let you have it.' I told him: 'If you will buy this note and hold it and allow us to pay it off in such sums as we can, it will suit us better, as we want to sell certain ranches and apply it whenever we can.' He was to give us a lower rate of interest. We were paying 8 per cent, and he agreed to let us have it for 7, for which he would charge us $1,500. When Mr. Wade told me they had the money, I went down there, and he had some notes prepared in the bank aggregating $29,500. The understanding was the first one of the

notes paid was to be the bonus note paid to get the money, and get the concession of interest, and to be allowed to pay the matter off as we wanted to. We had been informed that Mr. Teal had sent his note and assignment of his mortgage to the Savings Bank, so Wade informed me when we went in there. We went down, and he took up the note and assignment of the mortgage, and when we got back he showed me he had this note in his possession. I surrendered him the $29,500 note, or notes, with the understanding they should be kept together.

Q. Were you acting for them as agent in this transaction?
A. Yes, sir.

Q. You knew those notes were to raise that money to pay off that loan of Teal's?
A. No, I didn't know that they really owed the money before he got the notes; that is, he had the Teal assignment and Teal note before the notes were delivered to him.

Q. You say he had the money when the assignment was delivered to him. How do you know that?
A. I didn't say he had the money. I said he had the $28,000 note and assignment of mortgage when the notes were delivered to him."

It is argued that McLeod received his note June 29, 1898, and our attention is directed to certain testimony in support of this contention; but the answers cited do not support this theory, nor do we find anything in the record to that effect. True, it is disclosed that McLeod gave a check to Wade on that date for $7,000, for which he was to receive a note to be executed by appellants; but he does not state that the note was turned over at that time, and it is clear, from the record, that all the money necessary for taking up the Teal note and mortgages was advanced to Wade, and that the Teal instruments had been assigned to and were held by him as trustee, when this was done. All of this is consistent with Berkeley's statement to the effect that, when Wade told him he had the money, the notes were then prepared, and, on learning he had the assignment of the $28,000 note and mortgages, the new notes were then delivered to him. McLeod's check, dated June 29th, is shown by the stamp of the bank thereon to have been cashed the following day. The testimony of both McLeod and Hartman indicates that it was the

understanding between all the parties that the new notes should be secured by an assignment of the Teal note and mortgages to Wade, as trustee, and should be held by him in that capacity; the legal title to remain in him until the $29,500 consideration expressed in the new instruments should be paid in full, during all of which time the old note and mortgages should continue in full force and effect. By mutual consent he thereby became the holder and owner of the legal title to the indebtedness, as well as the party with whom defendants were expected to deal and to whom they were to make their payments. The claim of $29,500 was, accordingly, represented by the various instruments in the aggregate, and, as formerly stated, was in the same position as if the contents, conditions and effect of all the new instruments and agreements had been written across or attached to the old note and securities, and made a part thereof, though the method adopted was more convenient by reason of the separate notes representing and distinguishing their respective interests, etc. It is, accordingly, immaterial whether the signatures of the new notes were secured before or after June 29th, as they were of no binding effect until the entire transaction, including the assignment of the Teal note and mortgages, became complete, which, by relation, antedates the delivery of the notes, and which fact respondents are estopped to question, since the new notes, on which a decree is here sought, contained the indorsement: "This note is secured by a note of $28,000, signed by same parties, which is secured by real estate mortgages assigned to C. B. Wade, trustee." It is conceded that this indorsement was upon these notes at the time of their delivery. In fact, it is through this indorsement that respondents maintain their rights to foreclose the Teal mortgages.

It is also necessarily conceded that the old note and mortgages remained in force at least until the new notes were executed, which being true, it follows that when the new notes were delivered the Teal note and mortgages, by reason thereof, were either paid or not paid. If not paid, they then remained in

full force and effect until the entire indebtedness was liquidated, and, Wade having been made their custodian, and it having been required, as a part of the conditions upon which the money was advanced, that he should hold the same for respondents, it cannot be seriously questioned but that the payments made under such circumstances were made to the party authorized to receive them, and respondents would be bound accordingly. In that event, it would become a purchase outright, concerning which respondents would necessarily be bound by Wade's acts as much so as if the money advanced had been furnished without the execution and receipt of the new instruments. On the other hand, if the execution of the new notes paid the old debt, it would follow that the former note and mortgages became extinguished, and, while the new notes contain the indorsement that they are secured by the Teal instruments, yet, if paid and extinguished, this fact could be admissible only for the purpose of proving an oral agreement to execute a mortgage to secure the payment of the money advanced, or, what is its equivalent, an oral agreement to revive a mortgage that has been fully paid, to include not only the canceled claim, but an additional note of $1,500. Whether such agreement could be enforced in equity is not necessary to a determination of this suit. It is sufficient to observe that respondents do not seek a specific performance of such contract, nor is an issue to that effect disclosed by the pleadings.

But it appears here that the mortgages and note were duly assigned to Wade, and that Teal was paid in full by him with funds advanced by respondents for that purpose, thereby, up to that point, making it a purchase outright. Then, as evidence of the fact that neither the mortgages nor the note were deemed canceled, it was expressly understood and agreed, and so stamped upon each note issued, that it was secured by the old note and mortgages, thus clearly indicating that each was to remain in force and effect, to be available at any time there should be a default in the payment of any portion thereof, in accordance with the terms of the new notes, which not only secured the

interest of each of the parties advancing the money with which the Teal note and mortgages were purchased, but contained the additional terms in reference to the interest and the time of payment granted to appellants. We thus find them retaining and using the old note and mortgages through Wade, as holder of the legal title, with which to secure the indebtedness represented by the new instrument. The illustration given by Sturgis' counsel, where a party may be made a trustee by mere operation of law to protect innocent holders of negotiable instruments, is not applicable to the case at bar. The notes here involved are held by persons who, in law as well as in fact, are parties to the agreement whereby Wade was made their trustee, and where, by express agreement stamped on the notes, it is provided that the old instruments shall secure the payment thereof, and that this security was to be held by this expressly created trustee. In the one instance the trustee is created by operation of law, and, in the other, by an express and implied agreement of all concerned. The act of Wade (in his effort to perfect the deal and thereby make certain the $1,500 bonus, which he would otherwise have lost), in guaranteeing the payment of some of the notes, is not in any manner inconsistent with his position as agent for respondents during the transaction as well as after it became complete.

9. Nor are we aware of any rule precluding an agent from guaranteeing to his principal the payment of claims handled by him for such principal, especially, as in this case, where the agent was to be one of the beneficiaries in conjunction with the parties whom he was to and did represent. In this case, it appears that he was not only willing to guarantee the payment of some of the notes, but also consented to retain the old note and mortgage security, and that he received moneys from time to time, all of which constituted a means of aiding and insuring the payment of not only the full amount of money advanced, with interest, to the parties furnishing it, but his bonus as well, in proportion to the respective interests of each, thereby furnishing additional security to respondents for the money advanced by them. It is

hardly possible, nor is it reasonable, to assume that Wade was acting in any other capacity than as their agent, or to assume that, after the transaction was completed, he was agent for appellants in reference to matters here involved, for to do so would be to accept the conclusion that respondents adopted an extremely unbusinesslike method in this instance by retaining only the new notes, and, through Wade, as appellants' agent, permitting the payors and mortgagors to retain the mortgage security. The mere statement of this theory is sufficient for its answer.

It is also urged that there is nothing in the evidence of either of the parties indicating any agreement to the effect that the proceeds of the sale of the lands should be paid to Wade, and by him applied on the mortgage indebtedness, it being insisted that the proceeds received from the rent only could be thus considered. After a re-examination of the testimony, we find that the conclusion reached on this point in our former opinion is not only clearly deducible from the proceedings taken as a whole, but is manifest from the testimony of McLeod, as well as of Hartman, Sturgis' agent. McLeod, after stating that Wade was to hold the old note and mortgage as security for the notes, was asked:

"Q. Did he tell you anything about having these other notes further secured by having the city rents turned over to him?

A. I asked how he was to pay the interest on these notes. He said the rents was to come to him, and if any of the property was sold they would apply it on these notes. That is the reason he gave on or before five years after date, so they could have a chance to sell it.

Q. He also told you he would have these rents assigned to him to apply on the notes?

A. He said he could pay the interest because he was getting the rents.

Q. How did you get your interest payments you have on there? How was it paid to you and by whom?

A. He gave that credit on the back of them, and he made a memorandum of it always and held it, and always gave me credit on the back for it.

49 Or.—— 36

Q. Then you would bring in the note, and he would indorse the amount on the back?

A. Yes, sir."

That McLeod knew of the transactions going on, and received the benefits without objection, is manifested by the following question propounded to him, and his answer thereto: "Did you ask him (Wade) about any releases of mortgages he had made at any time? A. He said he was releasing property."

10. That Sturgis knew of the transactions, and with such knowledge recognized Wade as her agent and received the benefits thereof during all of this time, clearly appears from the various facts and circumstances disclosed by the record. For example, she authorized Wade to draw $7,000 from her bank account with which to procure the Teal note and mortgages securing the same. Both she and McLeod understood that Wade should collect and receive the rents of the mortgaged property, that the debt should be paid in installments, and that Wade would hold the Teal mortgages as security for respondents' notes. They were largely interested in the bank in which he was cashier and trusted him with the money. They went to him for their payments and never approached the appellants, or any of them; and, in addition to these circumstances, Mr. Hartman, the agent of Sturgis, says:

"Q. Tell us what Mr. Wade told you about that note.

A. He said he was taking it up—this large note of Teal's for $28,000— and wanted to handle it here at a reduced rate of interest, so that when the rents were collected, and any property sold, it could be applied on the payment of the notes in partial payments."

Here we have the purpose made known to Hartman before the deal was consummated, which, being followed with the making of Wade trustee for all, and acceptance of the note with statement endorsed thereon, through which she, with others interested, seek this foreclosure, makes the conclusion inevitable that Sturgis, with other respondents, in law, as well as in fact, recognized Wade as her agent; and while Wade, during the transaction until its completion, was the pivot around which all the

parties to the deal were acting, and to whom they looked for its proper consummation, his relationship with appellants, so far as the questions here involved were concerned, was at an end on its completion, and he thereafter continued as the agent of respondents only. He was made the custodian of and held the legal title to the Teal note and mortgages on which appellants, by agreement, oral and written, were bound to pay all rents and proceeds of sales to him, and in accordance therewith all payments were made to him, which acts respondents, to say the least, impliedly approved and did not question so long as they received the benefits, but seek to avoid that part of the arrangements thus made and recognized which may appear to be to their injury. It is settled that such cannot be sanctioned by courts of equity. Respondents, under such circumstances, are estopped from questioning Wade's authority to receive payments from defendants on this indebtedness, and that he was acting as their agent throughout the proceeding. It is too well settled to admit of serious discussion that the principal must adopt or reject the act of his agent as an entirety, and cannot receive the benefit of such agency without bearing its burdens: *Coleman* v. *Stark,* 1 Or. 116; *La Grande Nat. Bank* v. *Blum,* 27 · Or. 215 (41 Pac. 659).

11. We are quoted, in effect, as saying that all oral agreements between the parties were subsequently reduced to writing. In this deduction counsel are in error; our statement being that, as a part of the transaction, an agreement was entered into concerning the collection and disbursement of rents, which was afterwards reduced to writing, being the instrument there quoted. But we neither said, nor meant to say, that all the transactions were included in the written contract, as many took place afterwards. Nor was it necessary, under the status of the parties at the time suit was brought, that the written instruments should have included all dealings between them. Lands were sold and mortgages released, and the proceeds thereof having been accepted, and the oral agreements executed and acted upon, is sufficient to take the case out of the statute of frauds.

In fact, it is too well settled to admit of serious doubt that agreements, whether oral or partly oral only, when once executed, are binding on all parties thereto. As formerly stated, the old note, although in Wade's possession, is treated and recognized, not as evidence merely, but as having sufficient life to continue the mortgages in force and to entitle respondents to maintain this suit for their foreclosure, but for all other purposes are treated as extinguished, for, if available only as evidence of the existence and effect of the mortgages, it is to no purpose, as it could only tend to prove an intent to revive a canceled instrument, for which purpose it would be insufficient. In this connection it must be remembered that this is not an action on the notes, but a suit to foreclose the mortgages.

It is urged by counsel for Mrs. Sturgis that, as she did not file this suit, the statement in our former opinion to the above effect, to use counsel's language, "has been washed away by an avalanche from the record itself." True, she did not bring this suit, and appears only as one of the defendants; but, notwithstanding that feature, she has no interest in common with appellants, and was made a defendant only because of having an interest in the subject-matter involved, and by reason of refusing to join as one of the plaintiffs. Although a defendant, she affirmatively pleads and formally sets up her interests, and makes similar averments and seeks the same relief as the plaintiffs. From this it follows that, whether she be termed a plaintiff or defendant, or whether she joined in the filing of the suit, or subsequently saw proper to move and assert similar rights in the same manner through the same source, is immaterial, and, to say the most in favor of counsel's contention in this respect, is what might be termed a "distinction without a difference." The inconsistency of her position is manifest, whether we say, "for the purpose of bringing this suit," etc., or adjust our statement to what is, in effect, counsel's position on this point, and say, "for the purpose of seeking a decree of foreclosure in her favor she recognizes the old note as having sufficient life to entitle her to foreclose the mortgages for which she recognizes Wade

as her trustee, but considers the note extinguished, and denies Wade's trusteeship for any other purpose."

The transactions shown in this case clearly bring it within the principles announced and recognized in *Coleman* v. *Stark,* 1 Or. 116; *Wills* v. *Wilson,* 3 Or. 308; *Swegle* v. *Wells,* 7 Or. 222; *La Grande Nat. Bank* v. *Blum,* 27 Or. 215 (41 Pac. 659). And these decisions on the points here involved are in harmony with the great weight of cases in this country, many of which are cited in our former opinion. As is in effect clearly held in *Swegle* v. *Wells,* "the ordinary rules relating to commercial paper," referred to by counsel for McLeod, cannot apply to such cases; nor can it make any difference that the verdict of the jury in that case, to which our attention is directed, was left undisturbed, as the conclusion here reached is in harmony with the result there, both as to the law and the facts under consideration.

12. Other points upon the merits are urged by counsel for respondents, but all of them, like some we have here re-examined, are discussed in our former opinion, and sufficient reasons are not advanced to entitle them to further consideration. Our attention, however, has been especially directed to the moneys paid to Wade by appellants, concerning which it is maintained that his receipts are insufficient to cancel the indebtedness. In this connection, our attention is called to the "Wade-Despain Trust Account," by reason of which it is claimed that an agency is shown between Wade and defendants; that it shows a deposit to the credit of that account of $46,313.78 and a payment to the owners of the new notes of but $18,650; that this account discloses $7,000 yet due on the McLeod note, and $1,157.45 on the Sturgis note; and that the balance of the deposits was applied in payment of interest on the notes, taxes and insurance for defendants, including moneys paid to the Berkeleys and Despains, and in the cancellation of a certain note and mortgage on defendants' property in Union County, showing disbursements from this fund of $1,501 more than received. The fallacy in this contention lies in assuming that appellants are bound by everything shown by the books and checks relative to the Wade-Des-

pain Trust Account. This account was adopted by Wade after he had entered upon his duties as trustee for the holders of the new notes, and was merely a method adopted for his own convenience, over which appellants had no control. The money was paid to Wade, out of which certain sums were to be first paid, such as the $150 per month to Mrs. Despain and payment of taxes, etc., in accordance with the understanding of all; but it was immaterial to her, as well as to the other appellants, as to how the account was kept in the bank after having been paid to the party entitled to receive it. All in excess of the sums to be expended under the written agreement was paid to him for the purpose of reducing the principal and interest on the indebtedness covered by the mortgages, and was under the control of Wade only. He held the mortgages and original note, neither of which was extinguished until fully paid. Appellants, accordingly, paid the money to the holder of the legal title thereof, and it was not incumbent upon them to see that it was credited on the proper instrument: *Swegle* v. *Wells,* 7 Or. 222; *Hatfield* v. *Reynolds,* 34 Barb. 612.

The question as to the application of moneys received on the debt when collected by Wade became a matter between him and respondents only, and, if applied as it should have been, the debt was canceled, while, if not so applied, the effect, so far as the same may affect appellants, must be determined according to, and under, the well-known maxim that "equity looks upon that as done which should have been done," which would entitle the notes and mortgages to cancellation. In respect therefore to this account, it was opened by Wade as a trustee, and he thereby became the depositor, and, as such, alone had authority to draw upon it. A large part of the money deposited to the credit of this account is shown to have been paid to him by check, which checks were made payable to his order as trustee. The money therefore paid to and received by him was received in his trust capacity, and, so far as any part thereof was paid to appellants or disbursed on expenses of the trust, they are properly chargeable, but, so far as not thus paid, are chargeable against respond-

ents.   The books, statements, etc., showing the condition of the account, constitute admissions against his interest as trustee, and as such, were properly admitted in evidence for the purpose of showing the payments to him to be applied on appellants' indebtedness, for which they are accordingly entitled to credit thereon to the full amount of the sums shown by this account, as well as those disclosed by any other statements or receipts to have been received by him, in excess of disbursements made to and for them under their agreement.   The moneys therefore drawn from this account, which are properly chargeable to the appellants, are the sums paid to Mrs. Despain for her support, to the Berkeleys, for collecting rents and for taxes, insurance, repairs, etc., amounting to $17,756.50.

After a careful re-examination of the accounts, statements, deposit books, etc., showing receipts and disbursements by Wade, under his trust, we find the sums for which respondents are chargeable to be as follows:

June 29, 1898, 8 notes payable to Wade as trustee,
  aggregating .................................$29,500.00
Interest on same to December 30, 1904, date of last
  credit ..........................................  13,422.50
Aggregate amount paid to N. E. Despain..........   8,500.00
Amount paid to Norborne Berkeley...............   1,470.75
Amount paid to C. Berkeley ......................    129.35
Amount paid for insurance, taxes, repairs, etc......   4,644.04
Aggregate interest on last four sums (approximate)   3,425.00
                                                  ───────────
  Total .......................................$61,091.64

Moneys received by Wade, as trustee, from appellants and their agents are as follows:

Between July 29, 1898, and September 11, 1903, cash
  from Snyder ...............................$13,685.69
July 18, 1898, cash from LaFontaine..............   5,500.00
March 7, 1899, paid to C. B. Wade from sale of
  Grande Ronde ranch .........................   8,000.00
March 30, 1899, from sale of other property........   3,500.00
September 4, 1899, cash from Campbell from sale of
  land ........................................    302.00
September 8, 1903, cash from Florence Berkeley....   1,408.00

December 8, 1903, cash from Peringer.............. 1,050.84
Aggregate amount of interest on these payments from
   date of each thereof ..........·.............. 11,414.80
Total amount of rents collected.................. 17,756.50
                                                   ———————
    Total credits ...............................$62,617.83

It will be observed, therefore, from the statements, books, etc., introduced in evidence, that Wade, as trustee, received from appellants and for respondents, to be applied in the payment of the instruments secured by the mortgages, about $1,200 more than sufficient for the cancellation thereof.

It is urged, however, that the item of $3,500 was a loan to Wade by appellants, and that they should not be credited with this item; but we find nothing in the record to justify this inference, nor is there anything in the statement made by Berkeley to Hartman, testified to, when considered in connection with Berkeley's explanation thereof, to justify such conclusion. In fact, the receipt itself, which it is conceded was given for the money, is sufficient to rebut counsel's theory, it being as follows:

"Pendleton, Oregon, Mch. 30, 1899.

Received from the Despain Estate on account of Wade trustee mortgage, against the estate property, thirty-five hundred dollars to be applied on notes in final settlement—interest in accordance with terms of mortgage.

C. B. Wade, Trustee."

13. It is also contended that the $8,000 received from the sale of the Grande Ronde ranch should not be applied on respondents' claim. This again overlooks the legal effect of the agreement by which Wade was made the holder of the legal title to the Teal note and mortgages which were not to be deemed canceled until the entire amount represented therein should be paid. The evidence discloses that this land was sold and deeded to Wade by the Despains for the consideration of $8,000 over and above the mortgage liens thereon, under an express agreement that this sum should be applied on the mortgage indebtedness held by him against them, and that the deposit books of the Wade-Despain Trust Account show that he received this money

from them, placing it to the credit of this fund. This transaction was the same in effect as if the Despains had sold the farm, subject to the mortgage, to any other person, and paid the $8,000 received therefor to Wade on the mortgages, and he, in place of paying it to respondents under his trust, had loaned it to the purchaser, or to any other person with which either to cancel the lien on the farm sold or for any other purpose. In short, the question as to what he may have done with this or any other fund received from appellants for application on the mortgage indebtedness became, under the record herein, a matter for adjustment between the respondents and Wade, as their agent, and could not, as a matter of law, concern appellants.

Under any construction that may reasonably be applied to the evidence, as well as from any inference that may logically be deduced from the record, it appears that more than sufficient funds have been paid to the party lawfully entitled to receive them for the cancellation of the indebtedness.

It follows that the petition for rehearing should be denied.

REVERSED : REHEARING DENIED.