Argued 19 October, decided 5 December, 1904.

## HARLOW *v.* OREGONIAN PUBLISHING CO.

[78 Pac. 737.]

CONTRACT FOR SERVICES — CONSTRUCTION.

1. Where a newspaper carrier route contract required the carrier to deliver the paper to all paying subscribers within a designated territory, to endeavor to increase its circulation, to collect subscriptions, and to pay weekly for all papers taken from the office, receiving as compensation for his labor a certain proportion of the subscription price of the papers, and declared that the relation should continue until one party or the other considered a separation necessary, and, if the parties were then unable to agree on a proper method of doing so, arbitrators should be appointed, either party could terminate the contract at his election, subject to liability to the other for such damages as resulted therefrom.

INJUNCTION AGAINST BREACH OF CONTRACT — REMEDY AT LAW.

2. Where a newspaper carrier route contract provided for arbitration on the termination of the same by either party, and the carrier could obtain adequate redress by the recovery of damages for breach thereof, he was not entitled to an injunction restraining the termination or breach of the contract.

SPECIFIC PERFORMANCE — MUTUALITY.

3. A contract requiring the rendition of personal services of an unusual and personal nature dependent on experience and judgment, will not ordinarily be specifically enforced, and, conversely, the other party will not be enjoined from terminating the contract, both parties being left to their actions for damages.

From Multnomah: JOHN B. CLELAND, MELVIN C. GEORGE, and ALFRED F. SEARS, JR., Judges, in joint session.

Statement by MR. JUSTICE BEAN.

Suit by F. E. and L. A. Harlow against the Oregonian Publishing Company and H. L. Pittock. On April 11, 1864, the defendant Pittock, at that time the owner and proprietor of the *Daily Morning Oregonian*, entered into the following written contract with one Myron M. Southworth:

"A memorandum of an Agreement made this 11th day of April, A. D. 1864, between Henry L. Pittock, of the City of Portland, Oregon, and Myron M. Southworth, of the same place, that the said Henry L. Pittock has for the sum of $350 to be paid in weekly installments of $5.00 each, sold and transferred to the said Myron M. Southworth the sole right and privilege to carry and collect subscriptions for the *Daily Morning Oregonian* newspaper in all that portion of said city south of Alder Street; that the said Myron M. Southworth is to have one third of the subscription price of the said newspaper for his labor, with the privilege of selling his interest therein to a suitable party, and cannot otherwise be deprived of the advantages and benefits of this contract, although the said newspaper may change hands, unless he wilfully neglects or refuses to fulfill his portion of said contract and that said Myron M. Southworth agrees to carry faithfully and carefully the said newspaper to every paying subscriber in said district for the above-named compensation, to endeavor to increase its circulation on all occasions, to procure as much advertising patronage for it as possible without any percentage, to enter into no contract with any other newspaper published in this city without permission of the proprietor of said newspaper; to be responsible and pay weekly for all papers taken from the office and to comply with all rules and regulations not directly contrary to the above agreement the proprietor may from time to time, as he thinks proper, to adopt for the benefit of said newspaper.

It is also agreed that in case either party considers separation necessary and both cannot agree upon a proper method of doing so, each shall appoint a man to act for him; if they cannot agree they shall have power to call on a third man whose decision shall be binding. The said M. M. Southworth binds himself to carry the said paper for 12½ cents for each subscriber weekly, whether the subscription price be raised or not.

Henry L. Pittock,<br>Myron M. Southworth."

Southworth carried and delivered the paper, collected subscriptions, and otherwise fulfilled the obligations of

his contract, until May 25, 1865, when he sold and assigned his interest therein to Ballard & Sappington. They performed the contract for some time, and then sold to other parties; and thus, through successive sales and purchases, it came to John Harlow in 1868. Harlow in turn carried out the contract, complying with all its terms, until his death, in 1882, when he bequeathed it to his son, the plaintiff F. E. Harlow. On the 27th of September, 1898, F. E. Harlow sold to his co-plaintiff an undivided one third interest therein. In February, 1873, the Oregonian Publishing Company succeeded to the rights of Pittock in the newspaper. During the period from the date of the Southworth contract, in 1864, until September 18, 1901, with the knowledge, consent, and acquiescence of the defendants, Southworth and his various assignees, including the plaintiffs and their father, delivered the paper and collected subscriptions in all that portion of the City of Portland south of Alder Street.

On September 18, 1901, the defendant publishing company notified the plaintiffs, in writing, that it had decided to confine their operations under the Southworth contract to the territory south of Alder Street which was embraced within the corporate limits of Portland at the time the contract was made in April, 1864, and that on and after November 4th following it would place other carriers in the territory theretofore covered by plaintiffs, but which was not included within such boundaries. This suit was thereupon immediately commenced by plaintiffs to enjoin and restrain defendants from refusing to furnish them papers to deliver to subscribers residing south of Alder Street, but outside the boundaries of the city as they existed in 1864, and also to enjoin and restrain defendants from undertaking on their own behalf to deliver papers or collect subscriptions in the disputed territory, on the ground that such territory was embraced within the terms of the South-

worth contract. A demurrer to the complaint was over-ruled, and defendants answered. On April 1, 1902, but before the trial, the defendant publishing company served written notice on the plaintiffs that on and after June 7, 1902, it would cease to sell or deliver the *Morning Ore-gonian* to them or their agents or representatives for delivery to subscribers within that part of the city south of Alder Street, and that it would, from and after the date mentioned, deliver or cause the papers to be delivered to subscribers residing within such territory. The plaintiffs thereupon filed a supplemental complaint, setting out the repudiation and threatened breach of the contract by the defendants, and praying for an injunction restraining them from refusing to comply with the Southworth contract, and from delivering papers or causing them to be delivered to subscribers residing within the district covered by such contract. A demurrer to the supplemental complaint was overruled. Defendants answered, admitting the service of the notice, and that it claimed the contract to be void, but denying the other allegations therein. The cause was tried upon the pleadings and evidence, and a decree entered dismissing the suit, from which the plaintiffs appeal.

AFFIRMED.

For appellants there was an oral argument by *Mr. William Wick Cotton* and a brief over the names of *Benton Killin, William D. Fenton,* and *W. W. Cotton,* to this effect.

I. This arbitration clause is not revocable at the pleasure of the parties. It is a part of a contract that has been continuously executed since 1864 until the defendants, in 1901, refused to recognize its terms as to all the territory embraced therein. The submission relates to the termination of a partly executed contract, and distinctly provides that the only thing to be considered under the submission is determination of the contract or method by which it

shall be effected, and of necessity the amount, if anything, payable by one to the other in satisfaction of the mutual obligations and rights of the parties: *Lewis' Appeal*, 91 Pa. St. 359; *McKenna* v. *Lyle*, 155 Pa. St. 599 (35 Am. St. Rep. 910); *Hood* v. *Hartshorn*, 100 Mass. 117; *Palmer* v. *Clark*, 106 Mass. 373–389; *Haley* v. *Bellamy*, 137 Mass. 357; *Sweet* v. *Morrison*, 116 N. Y. 19 (15 Am. St. Rep. 376); *Herrick* v. *Belknap*, 27 Vt. 673.

II. While equity will, as a rule, decline to decree specific performance of a contract requiring the performance of varied and continuous acts, the enforcement of which would unduly tax the attention and superintendence of the court, yet this general rule is subject in its application to many limitations that arise out of particular cases in which the remedy afforded by the law is inadequate and incomplete, and in any event it will restrain interference and enjoin violation: *Western Union Tel. Co.* v. *Union Pac.* 3 Fed. 423; *Western Union Tel. Co.* v. *St. Joseph & W. R. Co.* 3 Fed. 434; *Wells, F. & Co.* v. *Northern Pac. Ry. Co.* 23 Fed. 4 (10 Sawy. 441, 18 Am. & Eng. R. Cas. 441); *Chicago & A. Ry. Co.* v. *New York L. E. & W. Ry. Co.* 24 Fed. 516; *Franklin Tel. Co.* v. *Harrison*, 145 U. S. 460; *Union Pac. Ry. Co.* v. *Chicago, etc., Ry. Co.* 163 U. S. 600; *Standard Fashion Co.* v. *Siegel-Cooper*, 157 N. Y. 60 (43 L. R. A. 854, 68 Am. St. Rep. 749); *Burlington* v. *Burlington Water Co.* 86 Iowa, 266; Bispham, Equity (5 ed.), p. 577; *Nordenfelt* v. *Maxim Nordenfelt Gun Co.* 63 Law Jour. Rep. Ch. 908 (6 Eng. Rul. Cas. 413); *Park* v. *Richmond & I. Tpk. Co.* 1 L. R. A. 198; *Appeal of Cornwall & L. R. Co.* 125 Pa. 232 (17 Atl. 427, 11 Am. St. Rep. 889); *Callery* v. *New Orleans Water Works*, 35 La. Ann. 798; *South Port. Land Co.* v. *Munger*, 36 Or. 457 (60 Pac. 5).

III. Even though the contract be classed with those of a strictly personal character, the rules governing and applicable to such contracts do not obtain where the intent

of the parties is expressed in such contract and takes from them their personal character : *Devlin* v. *May*, 63 N. Y. 8 ; *Carter* v. *State*, 8 S. Dak. 153 (65 N. W. 422); *Sloan* v. *Williams*, 138 Ill. 46 ; *Sunday Mirror Co.* v. *Galvin*, 55 Mo. App. 421; *Alford* v. *Smith*, 5 Pick. 232 ; *Wild* v. *Davenport*, 48 N. J. L. 129 (57 Am. Rep. 552); *Robbins* v. *Butler*, 24 Ill. 387 ; *Phillips* v. *Blachford*, 137 Mass. 510.

For respondents there was a brief over the name of *Dolph, Mallory, Simon & Gearin,* with an oral argument by *Mr. Rufus Mallory.*

MR. JUSTICE BEAN delivered the opinion of the court.

1. Assuming, for the purposes of the opinion, that the plaintiffs have legally succeeded to the rights of Southworth under the original contract, and stand in his place and stead, entitled to all the rights and privileges given him by its terms, and that it embraces all the territory claimed by them, there are two reasons why this suit could not be maintained after the repudiation of the entire contract by the defendants, and the service on the plaintiffs of notice to that effect in June, 1902: *first,* the plaintiffs, if they are entitled to any relief at all, have a full and complete remedy at law ; and, *second,* the remedy by injunction or specific performance is not mutual. It could not be invoked by the defendants against the plaintiffs, as the contract is not, and never was, capable of being specifically enforced or enjoined at the suit of Pittock or the defendant publishing company. The contract between Pittock and Southworth created substantially the relation of employer and employé, and this relation continued as to those who succeeded to Southworth's interest. By its terms Southworth (whom we shall hereafter assume includes parties who have legally succeeded to his rights), was to carry and deliver the paper to all paying subscribers within the designated territory, to endeavor to increase its circulation, to collect subscriptions therefor, and to

pay weekly for all papers he took from the office, receiving as compensation for "his labor" a certain proportion of the subscription price of the paper. This relationship was to continue until one party or the other considered a "separation necessary." In that event, if the parties were unable to agree upon "a proper method of doing so," each was to appoint one arbitrator, who, if they could not agree, should choose another, whose decision should be final. There may be room for controversy as to the intent and meaning of the arbitration clause, but it seems to us that it was intended, in case either party should desire to terminate the contract, to provide a simple and inexpensive method or means by which its value to the other could be determined, and the amount to be paid, if any, by the one desiring the separation, ascertained. The contract was undoubtedly thought to be advantageous to both parties at the time it was made. Southworth paid $350 for the sole right to carry and deliver the papers, and to receive as a compensation therefor a certain portion of the subscription price. This he supposed to be a valuable right, and one which would increase largely in value, according to his industry and diligence in extending the circulation of the paper, and the character of the services which he should render to its patrons. Pittock, on the other hand, was contracting for the future circulation of his paper, and the collection of subscriptions therefor in the given territory, and this he undoubtedly believed to be of value to the paper. It was to protect these rights, and to prevent the termination of the contract by either without making compensation to the other, that the arbitration clause was inserted. This, it appears to us, is its true intent and meaning.

We cannot think, however, that the agreement contemplated that the personal relationship between the parties should necessarily continue, against the will of either,

until the amount of compensation should be ascertained in the manner therein provided. Either party could terminate the contract when he considered it necessary, but, if the parties were unable to agree as to the amount of compensation to be paid by one to the other on account of such separation, they were to submit that matter to arbitration, but not the right to terminate the contract. The provision as to the duration of the contract, and the method to be employed in separation, or for determining the value in case separation should be deemed necessary, did not prevent either party from dissolving the relation between them at any time, subject to liability to the other for such damages as he may have sustained if it was not done in the manner provided. The contract created such a relationship of trust and confidence between the parties that a court of equity will not compel a continuation thereof against the will of either, but will leave the injured party to his relief at law. The contract, by its terms, was subject to termination at any time; the party desiring the termination, however, to pay its value to the other. If the termination or separation took place in the manner provided, the value or amount to be paid would be ascertained and determined by arbitrators. If not, the party guilty of the breach would be liable in an action at law for damages, the same as for the breach of any other contract.

2. It follows, therefore, that whether the action of the defendant corporation in repudiating the contract and notifying the plaintiffs that it would no longer be bound thereby be deemed a separation within its terms, or a breach thereof, the effect was to terminate the contract; and the only question between the parties remaining for adjustment is the amount, if any, to be paid by the defendants to the plaintiffs on account of such separation or breach. That question is not cognizable by a court of

equity. An injunction to restrain the breach of a personal contract, or one relating to personal property, or a mandatory injunction to compel specific performance of such a contract, will not be granted when the recovery of damages at law would adequately redress the impending injury: *Chicago & A. R. Co.* v. *New York, Lake Erie & W. R. Co.* (C. C.) 24 Fed. 516; *Richmond* v. *Dubuque & Sioux City R. Co.* 33 Iowa, 423; *Port Clinton R. Co.* v. *Cleveland & Toledo R. Co.* 13 Ohio St. 545; 26 Am. & Eng. Enc. Law (2 ed.), 17. Indeed, the basis of equitable interference in cases of specific performance is a want of an adequate remedy at law. Mr. Waterman says: "A court of equity will not grant relief where the complaining party will not be deprived of any legal right by withholding it, unless he can show clearly that he is entitled to the relief sought. If the plaintiff has an adequate remedy at law, he must seek his redress there": Waterman, Spec. Perf. § 9. The same rule is laid down by Judge Story, Mr. Fry, and Mr. Pomeroy: 1 Story, Equity (10 ed.), § 716; Fry, Spec. Perf. § 12; Pomeroy, Spec. Perf. (2 ed.) § 24.

It is admitted, as we understand it, that a court of equity will not decree a specific performance of the contract in suit because it requires varied and continuous acts on the part of the defendants, but it is argued that it will enjoin the defendants from violating the contract by delivering papers, or causing them to be sold and delivered, within the territory embraced in plaintiffs' contract, until such time as the defendants take the proper steps provided in the contract for its termination. Although the remedy suggested is negative rather than affirmative, it is, in effect, a decree for the performance of the contract. Enjoining the defendants from delivering papers or causing them to be sold and delivered in the disputed territory would practically enforce the contract, and require them to furnish

the papers to the plaintiffs to be so delivered.  A prohibition preventing a violation of the contract by the defendants would in this case as effectually compel its performance as an affirmative order to that effect.  The leading case holding that, although a court of equity cannot compel the specific performance of a personal service contract, it may enjoin a violation of the negative provisions thereof, is that of *Lumley* v. *Wagner*, 1 De Gex, M. & G. 604.  In that case the defendant had agreed with plaintiff to sing at his theater for a definite time, and not to sing elsewhere. She threatened to sing at another theater in violation of her contract.  In a suit to enjoin her from so doing, the court held that it could not enforce the affirmative part of the contract, because it could not compel the defendant to sing, but it could and would enjoin and restrain her from singing elsewhere.  In this case the contract was for a definite, fixed time, and plaintiff's remedy at law was manifestly inadequate, because the damages which would accrue to him by a violation of the contract by the defendant could not be ascertained with any certainty.  The same is true of *Singer Sewing Machine Co.* v. *Union Buttonhole Co.* 1 Holmes, 253 (Fed. Cas. No. 12904) ; *Standard Fashion Co.* v. *Siegel-Cooper Co.* 157 N. Y. 60 (51 N. E. 408, 43 L. R. A. 854, 68 Am. St. Rep. 749) ; *Burlington* v. *Burlington Water Co.* 86 Iowa, 266 (53 N. W. 246), and other cases cited by the plaintiffs.

4.  We are therefore of the opinion that plaintiffs cannot maintain this suit, for the reasons stated.  There is, however, another objection to the enforcement of the contract in equity at the suit of the plaintiffs, and that is because the remedy is not mutual, and defendants could not compel the plaintiffs to perform.  It is a fundamental rule of equity that when, from the nature of the contract, it is incapable of being enforced against one party, that party is

45 OR.——34

rendered equally incapable of enforcing it against the other, though its execution in the latter way might in itself be free from the difficulty attending its execution in the former. Unless a court of equity can execute the contract on both sides, it will generally not interpose in behalf of either party. To compel one to perform specifically, and send the other to a court of law to recover damages, would be in violation of the established principles of equity : Pomeroy, Spec. Perf. (2 ed.) § 165; Fry, Spec. Perf. § 286; Waterman, Spec. Perf. § 198; *Marble Co.* v. *Ripley*, 77 U. S. (10 Wall.) 339; *Richmond* v. *Dubuque & Sioux City R. Co.* 33 Iowa, 423; *Tyson* v. *Watts*, 1 Md. Ch. 13; *Hoover* v. *Calhoun*, 16 Grat. 109; *Shenandoah Valley R. Co.* v. *Dunlop*, 86 Va. 346 (10 S. E. 239); 26 Am. & Eng. Enc. Law (2 ed.), 28. Now, as we have already stated, among the stipulations in the contract for performance by Southworth are that he shall carry the paper faithfully and carefully to every paying subscriber in the district ; that he will endeavor on all occasions to increase the circulation, and will procure as much advertising patronage as possible ; that he will be responsible and pay weekly for all papers taken from the office ; and that he will comply with all rules and regulations that the proprietor of the paper may see fit to adopt from time to time, not inconsistent with his contract. These provisions call for the performance of varied and continuous acts on the part of Southworth, requiring skill, energy, experience, judgment, and integrity. It will not be contended, we think, that a court of equity can or will decree the specific performance of such a contract, because the enforcement of its decree would require such constant superintendence as to make judicial control a matter of extreme difficulty, if not an impossibility. See authorities last cited.

For these reasons, the decree of the court below should be affirmed, and it is so ordered.        AFFIRMED.