Argued January 26, decided March 9, 1909.

## HARLOW v. OREGONIAN PUB. CO.

[100 Pac. 7.]

ASSIGNMENTS—CONTRACTS ASSIGNABLE—CONTRACT FOR PERSONAL SERVICES.

1. Where a contract is for personal services, requiring a high degree of trust and confidence, without a definite limitation as to time, and free from any declaration therein to the effect that its terms shall be binding upon the heirs and assigns of the contracting parties, the contract is not assignable by one of the parties thereto without the consent of the other, and without such consent creates no estate which can be devised or descend to the heirs of either of the parties.

ASSIGNMENTS — CONTRACTS — ASSIGNABILITY — CONTRACT FOR PERSONAL SERVICES.

2. Even if such a contract did not within itself provide that it should bind the parties' heirs and assigns, if it has been recognized and acted upon by the parties interested, they cannot object that it makes no provision for assignment or transfer, since they cannot knowingly or with implied knowledge thereof receive the benefits without assuming the burden accompanying them.

CONTRACTS—EXTRINSIC EVIDENCE—EXPLAINING WRITTEN CONTRACT.

3. Where a written contract is ambiguous, extrinsic evidence of the practical interpretation given it by the parties is admissible to explain it, and the parties' intention to regard it as assignable may be implied by their conduct and their acquiescence in its terms.

CONTRACTS—ACTIONS FOR BREACH—EVIDENCE—CONSENT TO METHOD OF DEALING.

4. In an action by transferees of a contract with the owner of a newspaper for its breach by the successors of the original owner, where the defense was that the contract was not transferable, proof that defendants had shared in the fruits of business done under the contract by plaintiffs without objecting to their operations without direct evidence of defendants' actual knowledge

of the tranfers would *prima facie* show their consent and acquiescence in the contract as transferred, even though the original contract did not provide for its transfer.

CONTRACTS—ACTION FOR BREACH—EVIDENCE.

5. In an action by transferees of an original contract with the owner of a newspaper for its breach by the successors of the owner, evidence of defendants' knowledge that the contract had been repeatedly transferred, and that plaintiffs were working as transferees under the original contract and acquiescence therein, *held* sufficient to go to the jury.

ARBITRATION AND AWARD—AGREEMENT TO SUBMIT—CONSTRUCTION—
    SCOPE OF ARBITRATION.

6. A contract between the owner of a newspaper and another for the sale of rights in a newspaper route provided that if either party considered separation necessary, and could not agree upon a proper method of doing so, arbitrators should decide. *Held*, that in view of the fact that the contract could be canceled at any time, and in view of the nature of the business, whereby a person in possession of such a route can build up a business, the good will of which becomes very valuable, the parties contemplated that the rights were to be of some value, and that damages must necessarily accrue upon the dissolution of the contract, and their intent was that, upon such an event, arbitration should be had of the value of the good will of the business, subscription lists and other matters incidental thereto, and not merely of such questions as related to the settlement of the parties' accounts.

From Multnomah: CALVIN U. GANTENBEIN, Judge.

Statement by MR. JUSTICE KING.

This is an action for damages for an alleged violation of a contract originally entered into between Pittock, as owner of the Daily Morning Oregonian, and Myron M. Southworth, which contract was by mesne assignments transferred to F. E. and L. A. Harlow, plaintiffs herein, and is as follows:

"A memorandum of an agreement made this 11th day of April, A. D. 1864, between Henry L. Pittock, of the City of Portland, Oregon, and Myron M. Southworth, of the same place: That the said Henry L. Pittock has for the sum of $350 to be paid in weekly installments of $5.00 each, sold and transferred to the said Myron M. Southworth the sole right and privilege to carry and collect subscriptions for the Daily Morning Oregonian newspaper in all that portion of said city south of Alder street; that the said Myron M. Southworth is to have one-third of the subscription price of the said newspaper for his labor, with the privilege of selling his interest therein to a suitable party, and cannot otherwise be deprived of the advantages and benefits of this contract, although the said newspaper may change hands—

unless he willfully neglects or refuses to fulfill his portion of said contract; that said Myron M. Southworth agrees to carry faithfully and carefully the said newspaper to every paying subscriber in said district for the above-named compensation; to endeavor to increase its circulation on all occasions; to procure as much advertising patronage for it as possible without any percentage; to enter into no contract with any other newspaper published in this city without permission of the proprietor of said newspaper; to be responsible and pay weekly for all papers taken from the office and to comply with all rules and regulations not directly contrary to the above agreement, the proprietor may from time to time, as he thinks proper, to adopt for the benefit of said newspaper. It is also agreed that in case either party considers separation necessary and both cannot agree upon a proper method of doing so, each shall appoint a man to act for him; if they cannot agree they shall have power to call on a third man whose decision shall be binding. The said M. M. Southworth binds himself to carry the said paper for 12½ cents for each subscriber weekly, whether the subscription price be raised or not.

"Henry L. Pittock.
"Myron M. Southworth."

The breach complained of relates to the last paragraph of the agreement, in respect to which it is averred that defendants, after having declared the contract at an end, refused to submit the matters arising out of the contract and dissolution thereof to arbitration.

The cause was tried before a jury, resulting in a judgment against defendants and in favor of plaintiffs in the sum of $5,000, from which defendants appeal, urging as error the action of the trial court in refusing to strike out all of plaintiffs' testimony, the denial of defendants' motion for nonsuit, and the refusal, on defendants' request, to direct a verdict in their favor.

AFFIRMED.

For appellants there was a brief over the names of *Messrs. Dolph, Mallory, Simon & Gearin,* with an oral argument by *Mr. John M. Gearin.*

For respondents there was a brief over the names of *Mr. Ben C. Dey, Mr. William D. Fenton* and *Mr. P. L. Willis,* with an oral argument by *Mr. Fenton.*

MR. JUSTICE KING delivered the opinion of the court.

1. The first point presented for consideration is whether plaintiffs have, in law, succeeded to all the rights and interests of Southworth under the agreement quoted, and are thereby placed in all respects in the position formerly occupied by him. It appears to be well settled that where, as in this case, the contract is for personal services, requiring a high degree of trust and confidence, without a definite limitation as to time, and free from any declaration therein to the effect that its terms shall be binding upon the heirs and assigns of the contracting parties, such agreement is not assignable by one of the parties thereto without the consent of the other, and without such consent creates no estate which can be devised or descend to the heirs of either of the parties. *Corwin* v. *Hood,* 58 N. H. 402; *Dickinson* v. *Callahan's Adm'rs,* 19 Pa. 227; *Howe Sewing Machine Co.* v. *Rosensteel* (C. C.), 24 Fed. 583. This rule, however, is limited to such cases as where the exceptions mentioned do not appear.

2. Under the facts presented, it is unnecessary to determine whether the memorandum of agreement before us, contains within itself terms providing for the power to assign, etc., for it is unquestionably the law that, even though the instrument within itself does not provide that it shall bind the heirs and assigns of the parties thereto, if it has been recognized and acted upon by the parties interested, the objection that no provision is made therein for its assignment or transfer is untenable. The benefits cannot knowingly, or with implied knowledge thereof, be received without the recipient assuming the burdens which may accompany them. Page, Contracts, §§ 73, 1262; 9 Cyc. 387; *McLeod* v. *Despain,* 49 Or. 536,

563 (90 Pac. 492: 92 Pac. 1088) ; *Nave* v. *Sturges,* 5 Mo.
App. 557; *Bailey* v. *Rutjes,* 86 N. C. 517; *Stucky* v.
*Hardy,* 15 Ind. App. 19 (41 N. E. 606) ; *Weatherhogg* v.
*Board of Com'rs,* 158 Ind. 14 (62 N. E. 477)·; *Staples*
v. *Somerville,* 176 Mass. 237 (57 N. E. 380) ; *Freedman's
Savings Bank* v. *Shepherd,* 127 U. S. 494 (8 Sup. Ct.
1250: 32 L. Ed. 163) ; *Atlanta Buggy Co.* v. *Hess Spring
Co.,* 124 Ga. 338 (52 S. E. 613: 4 L. R. A. (N. S.) 431).

3. Nor can it be seriously questioned that where the
language of the contract, like the one under considera-
tion, is ambiguous, the terms thereof may be explained
by extrinsic evidence, in which event the intention of the
parties to regard the contract as assignable may be
implied ·from their conduct with reference to and acqui-
escence in its terms. Page, Contracts, § 1126. In such
cases the practical interpretation as applied to the instru-
ment under investigation by the parties may be taken
into consideration to determine their intention. *Topliff*
v. *Topliff,* 122 U. S. 121, 131 (7 Sup. Ct. 1057: 30 L.
Ed. 1110) ; *Knopf* v. *Richmond, F. & P. R. Co.,* 85 Va.
769 (8 S. E. 787) ; *Heatherly* v. *Bank,* 31 W. Va. 70, 77
(5 S. E. 754) ; *City of Cleveland* v. *Cleveland, C. C. &
St. L. Ry. Co.* (C. C.), 93 Fed. 113, 117; *Latemser* v.
*Misner,* 56 Neb. 340 (76 N. W. 897) ; *Fitzgerald* v. *First
Nat. Bank,* 114 Fed. 474 (52 C. C. A. 276).

4. But it is argued that defendants during the many
years of business dealings respecting the Oregonian with
Southworth's successors in interest, had no knowledge
or notice of any of the assignments under which plain-
tiffs and their assignors were operating, and through
which the plaintiffs asserted, and now assert, their
claims, in which respect it is insisted there is a total
failure of proof. We cannot accede to this view. It is
disclosed by the record, as in effect detailed by Mr.
Justice BEAN in *Harlow* v. *Oregonian Publishing Co.,*
45 Or. 522 (78 Pac. 737), that Southworth entered upon
the performance of his contract, complying with its

terms until May 25, 1865, when he transferred his inter-
est to Ballard and Sappington, who, three years later,
assigned to John Harlow, and he, in turn, carried out
the contract, complying with all its terms until his death
in 1882, when he bequeathed all of his interest therein
to his son, F. E. Harlow, who in September, 1898, sold
an undivided one-third interest therein to his co-plaintiff.
During this period the Oregonian Publishing Company
succeeded to the rights of Pittock, who made the original
agreement with Southworth. On January 16, 1901, the
company by letter informed F. E. Harlow that, in accord-
ance with what it stated was the spirit of the contract,
entered into between Pittock and Southworth, under
which he was operating, it desired to make some changes
with reference to the manner of handling the paper,
requesting him to confer with its representatives regard-
ing these changes. On August 16th following, the com-
pany sent another letter, purporting to inform him of
the boundaries of the City of Portland as they existed
at the date of the contract, and indicating that he was
limited under the agreement to that territory. This was
followed in September by a letter, which, among other
things, informed Harlow that after November 4, 1901,
the Oregonian Company would place other carriers in
the territory not included in the Southworth contract,
requesting him to give the company a complete list of
the names and addresses of the subscribers within the
City of Portland, and without the boundaries as they
existed on February 27, 1864. Following this letter, the
defendant company on April 1, 1902, wrote plaintiffs,
notifying them that after June 7th of that year it would
cease to sell to them, their agents, or representatives, or
any of them, the Morning Oregonian for delivery to
subscribers therefor within the limits of any part of
Portland. It will be observed from these letters that
the company fully recognized and considered that plain-
tiffs and their agents were working under the contract

originally executed to Southworth, under which plaintiffs and their assignors were, and had been, operating. However, it appears, in fact it is unquestioned, that from the date of the contract in 1864 until September 18, 1901, Southworth, followed by the various assignees, including the plaintiffs, handled the newspaper route, delivered the paper, and collected subscriptions in all that portion of the City of Portland, south of Alder street, and that during all of this long period, Pittock until 1873, and thereafter the Oregonian Publishing Company, shared in the fruits of the business, making no objections to the operations of Southworth's successors in interest under the contract. Proof of these facts, without direct evidence of actual knowledge on the part of the defendants, constituted a *prima facie* showing of their consent and acquiescence in the contract, shifting to them, if questioned, the burden of rebutting the inference deducible therefrom. Other circumstances and facts are disclosed by the record, but further enumeration thereof is unnecessary, as the facts and circumstances narrated were ample for the consideration of the jury, in determining whether defendants acquiesced in, and consented to, the various assignments of the original contract.

5. Nor is the defense available that because Pittock sold out to the Oregonian Publishing Company, the company, as such purchaser, is not bound by his contract with Southworth. Defendant company accepted the benefits of the contract, which precludes it from questioning that it was bound by the terms thereof. Sufficient evidence of knowledge on its part of the original contract, and those asserting rights thereunder appears in the record to entitle the question to be submitted to the jury, the decision of which is conclusive. For example, the defendant company through its manager, presented claims to the executor of the estate of John Harlow, deceased, who during his lifetime was one of the assignees of the original contract on matters arising out

of the dealings the defendant had with decedent under the contract. Other circumstances and facts disclosed by the record might be cited implying sufficient knowledge on the part of the company of the business dealings growing out of the Pittock-Southworth contract, by which dealings it was benefited, to bind the company, but suffice to say that we think the evidence on these points ample for submission to the jury.

6. The next problem with which we are confronted is whether, under the evidence, defendant is liable to plaintiffs in damages for having declared the contract at an end and in refusing to arbitrate. Each was in a position to terminate the contract at any time desired, subject to the further provision that if an agreement could not be reached as to the terms of separation, or as to the compensation to be paid by one to the other on account thereof, their differences should be submitted to arbitrators, to be selected in the manner provided in the contract. In place of pursuing this course, it appears, as stated, that the company notified plaintiffs that after June 7, 1902, it would cease to sell or to deliver papers to them, or further recognize their agents, or representatives, or any of them, as being in any way entitled to represent such company within any part of the corporate limits of Portland. This clearly amounted to a declaration that the contract under which the parties thereto had for many years been operating, and under which all the agents had worked since the date of the agreement with Southworth, was at an end. Plaintiffs refused to accede to these demands, or in any manner recognize the notices given them by the company as having any binding effect, and brought a suit in equity to enjoin the defendants from placing new agents in the field, and from in any manner interfering with their newspaper route, etc. *Harlow* v. *Oregonian Pub. Co.,* 45 Or. 520 (78 Pac. 737). This case was thereafter tried, resulting in a dismissal thereof on the grounds that plaintiffs

had an adequate remedy at law for such injuries, if any, as they may have sustained by reason of the cancellation of the contract.

After the termination of the suit, plaintiffs, pursuant to the terms of the original contract, demanded of defendants that they submit the differences between them to arbitration, which was refused, by reason of which this action was brought and the judgment for damages complained of secured. It was, in effect, held by this court in the former case that, if the dissolution occurred at the instance of one without the consent of the other, the differences between them, if any, including such compensation as should be made, the party injured thereby, if not otherwise amicably adjusted, were to be ascertained and determined by arbitrators, and, if not, "the party guilty of the breach would be liable in an action at law for damages, the same as for the breach of any other contract."

The fact, however, that the contract of employment under which plaintiffs were parties was not made for any certain or definite period of time, but left open for cancellation at the will of either of the parties to it, makes the question as to what constituted a breach difficult of solution. In this connection it must be remembered that neither could compel the other against his will to continue under the contract, the reasons for which are obvious. The fact, then, that the contract provided a method for its termination, when considered in connection with the peculiar nature of the business therein provided for, clearly contemplated that the rights acquired under the contract were to be of some value, and that damages must necessarily accrue to one or the other upon its dissolution. It was accordingly intended therein to provide that, if a separation should occur under circumstances not agreeable to all concerned, some just and equitable allowance would be made to the party injured thereby. It is unquestionably true, as the testi-

mony indicates, that after years of service by agents in charge of newspaper, routes the good will of the business and right to the territory covered by their work becomes very valuable. Southworth as early as 1864, when the population of the territory as compared to the date of dissolution was exceedingly small, agreed to give $350 for the privilege of engaging in the business, and, as evidence of its increased value, it appears that in 1898 the business had assumed such proportions that L. A. Harlow paid his co-plaintiff $5,000 for a one-third interest therein. If, therefore, the defendant company could at its will cancel the business relations existing between them, and, as contended, submit to arbitration only such questions as relate to the settlement of their accounts, and at the same time require plaintiffs to turn over to it all the property in their possession, such as books, subscription lists, etc., it would become possessed, without cost, of valuable rights, a subsequent sale to other parties of which would command a very large sum of money. The nature, character, and peculiar scope of this class of business must be considered in connection with and in the interpretation of the contract, and it would be unreasonable to assume that it was the intention of the parties to permit a separation on the inequitable basis contended for by defendants. The reasonable and logical inference, when viewed in connection with all the surrounding circumstances to be gathered from the contract, is that it was to avoid the possibility of an unfair adjustment, at the will of the party to be benefited, that it was provided that in case of a disagreement arbitrators might be called. Had an arbitration been had, the value of the good will of the business and of the subscription lists, together with various other matters incidental thereto, could have been considered and taken into account in determining the loss on the part of one and the gain by the other, and the value of the business to be delivered by plaintiffs to defendant company thereby ascertained.

But, as stated, defendants, in violation of the terms of the contract, refused to submit to arbitration; and for the breach occasioned by this refusal the action was brought and · the damages sustained thereby assessed by the jury.

Under the view most favorable to the defendants, sufficient evidence was adduced on all of the material issues to entitle the cause to be submitted to the jury, from which it follows that no error was committed in denying the motion for nonsuit, and the request to direct a verdict for defendants was properly refused.

The judgment of the court below is affirmed.

AFFIRMED.