## TIMES–PICAYUNE PUB. CO. v. MOLENAAR.
### No. 14564.

Court of Appeal of Louisiana. Orleans.
Jan. 15, 1934.

Wisdom & Sokolsky and John Minor Wisdom, all of New Orleans, for appellant.

Spencer, Gidiere, Phelps & Dunbar, of New Orleans, for appellee.

HIGGINS, Judge.

Plaintiff, which is engaged in the business of publishing a daily newspaper in the city of New Orleans, sued the defendant, one of its former newspaper carriers, to recover the sum of $779.56, representing the balance due on the purchase price of certain newspapers which were sold by it to him.

The defendant answered admitting the correctness of the amount claimed, but averred that he should not be condemned to pay the account because the plaintiff is indebted to him in the sum of $1,363, which is claimed in reconvention, on the ground that he was employed under "a contract which existed and arose from the unexpressed, but manifest custom and usages of the said publishing company; that it is a long recognized custom of the said company to pay carriers $1.00 for each subscriber at the termination of their contract in recognition of the property right a carrier has in his route list"; and, in the alternative, that "if there is no valid contract obliging the Times-Picayune Publishing Company to pay him $1,363.00, that the Company is liable in damages to that amount for taking of his property" (i. e., the newspaper route).

The plaintiff countered by denying that there was any implied or expressed agreement arising from custom to pay the carrier $1 for each subscriber when the carrier either left the employment of the company voluntarily, or was discharged, claiming that the $1 for each subscriber was given to the carrier as a mere gratuity; and further, if the court should find that there was an express or implied agreement to purchase the carrier's route on the termination of his employment, defendant and plaintiff in reconvention is not entitled to this sum under the circumstances of this case, because of his conduct in failing to comply with certain conditions precedent, which also arose from custom, of filing a geographical list of the route with the names and addresses of subscribers, collection days, delivery instructions, etc., and in failing to familiarize the new carriers, who were to replace him, with the route by taking them around with him, all of which was required in order to facilitate the prompt and efficient delivery of and collection for the papers.

There was judgment in favor of the plaintiff, as prayed for, and dismissing the reconventional demand, and the defendant and plaintiff in reconvention has appealed.

The evidence shows that for a great number of years it has been the custom of the plaintiff and its predecessors to employ carriers, who have the exclusive right of selling and delivering newspapers in certain designated areas. The subscribers are obtained by the efforts of both the company and the carriers; the papers delivered to the subscriber secured by the company being charged to the patron, and the papers delivered to those who subscribe through the carrier being charged to him, who in turn charged the customers and collected from them.

The defendant purchased his route from another carrier for $60, or at the rate of $1 for each subscriber, and during the thirty-two years of his connection with the company, through its representatives and his own efforts the route grew to 1,363 subscribers.

Until 1926 it was the custom of the plaintiff to permit the carrier to sell his route to other persons, desiring to become carriers, at the rate of $1 for each subscriber, who continued to take the paper for more than thirty days after the old carrier had left the employment of the company; provided, first, that the person to be substituted was acceptable to the company, and, second, that a settlement was made by the retiring carrier of his indebtedness to the company. On October 11, 1926, the board of directors of plaintiff passed a resolution authorizing its president to purchase or acquire such carriers' routes as he might deem advisable and to pay therefor on the basis of $1 for each subscriber.

In addition to delivering and collecting for papers, the carrier was required to collect insurance premiums on policies of insurance issued in connection with the subscriptions and also to solicit new subscribers. It appears that the defendant objected to the company's instructions to go with other young men or boys to solicit subscriptions, and he also felt that the company was desirous of dividing his very large route so as to give employment to several young men as carriers. Being dissatisfied, and believing that the company was about to take all or a part of his route from him, he went to one of the plaintiff's competitors (there being four daily newspapers in the city of New Orleans at the time) in order to determine upon what basis it would employ him as its carrier in the same territory. About five weeks before defendant's employment with the plaintiff terminated, some one informed the representatives of plaintiff that the defendant was going to give up his route and enter the employment of a competitor. He was called to plaintiff's office and admitted that he had entered into such negotiations, but had not fully made up his mind as to what he would do, but that in the event he decided to go with the other company he would com-

ply with the custom of turning over his route list containing the names and addresses of the subscribers in geographical rotation in order to expedite the quick delivery of the papers, and information concerning collection days and delivery instructions, all of which could be utilized by the new carrier in going through the territory, before assuming charge, either in company with the retiring carrier or by himself in order to become familiarized with his new work.

About two weeks later the defendant was again called to the office for the purpose of ascertaining his answer on the question of leaving or remaining in the company's employ. Again he stated that he was undecided, but that, if he did leave, he would prepare the route list and turn it in to the office.

Approximately a week later and about two weeks before he left the company's employ, further inquiry as to his intentions was made, and he then stated he had finally decided to resign and go with the competitor. He was then informed that he should prepare the regular route list and file it at the office within a reasonable time, before leaving, in order that it might be verified and the new carrier or carriers familiarize themselves with the proper way of serving the route so that business would continue uninterrupted. He promised to comply with this request, but each time his attention was called to the matter he stated that he had not had sufficient time to get up the list or complete it, as he was very busy. The company's representatives furnished him with the proper blank forms for the preparation of the route list and volunteered to send the necessary help to assist him in getting it up, but the defendant refused to accept any help, insisting that he preferred to do it himself.

Finally, he was pinned down to a definite date and time for delivery of the list, but he failed to appear at the appointed time. One of the officers of the company admonished him as to the necessity of having the list completed and turned into the office within a reasonable time before he left and assured him that he would be paid the usual $1 for each subscriber who remained after the thirty-day period had elapsed from the time he left the company's employment, but still he did not file the list. Thereafter, upon further inquiry, defendant stated that it was his intention to file this list with the company on a Sunday evening about 5 o'clock, and that on the following Monday morning it could place its own carriers upon the route. Plaintiff's officer informed him that this was entirely unsatisfactory and contrary to the usual practice and attempted to reason with defendant, but the defendant said if that was not agreeable plaintiff could immediately take the route. The officer informed defendant that he would take the route the next morning and at that time sent sixteen men into the territory to deliver the company's papers.

Conceding that there was an implied or express contract arising from custom which obliged the company to reimburse the carrier at the rate of $1 for each subscriber who remained as such after thirty days had elapsed from the time the carrier left the company's employ, a view most favorable to the defendant, but without deciding that issue and expressly refraining from giving our opinion upon that question, we shall pass to a consideration of the two contentions made by the defendant as plaintiff in reconvention. The first is that the amount of $1 per subscriber was unconditionally due and, secondly, if there were any implied conditions, that the defendant has reasonably fulfilled them. It is quite plain to us that the sum of $1 is not unconditionally due because the great preponderance of the evidence shows that the carriers who left the company's employ either turned in the route lists, or card indexes which were similar thereto and took the new carrier over the route with them before giving up the work, or furnished the necessary information by which the new carrier could familiarize himself with the route before he assumed the responsibility therefor.

It is equally clear to us that the defendant did not reasonably or fairly comply with the condition precedent to furnish the route list because, in spite of the repeated demands and efforts of the company's representatives on a number of occasions to secure it from defendant, he failed to file it. His only excuse for not having furnished it was that he was too busy and could not find the time to prepare it within the two or three weeks allowed him by the company. But his refusal to accept the plaintiff's representatives' co-operation and assistance in preparing the list in order that it might be filed within some reasonable length of time was purely arbitrary. He had in his possession a card index of the subscribers in rotation, which was equivalent to an arrangement in geographical order of the subscribers, but he did not tender these cards as other carriers had done when they left.

The alphabetical card index, which was referred to as the "A B C" list (meaning the list which was filed with the Audit Bureau of Circulation at Chicago, in order that those who advertised in a paper or periodical could definitely determine the extent of that publication's circulation), at the time this controversy arose, had been filed in Chicago.

The other alphabetical card index of subscribers at the company's office was revised once every six months and was shown to be most inaccurate, particularly with reference to the large route in question, as the defendant had not carried out the company's in-

structions of filing new cards covering new subscriptions and other cards to show when a customer had given up his subscription. So that this index was inadequate and not comparable to the regular route list.

■ Finally, the defendant contends that the carrier's route, which he built up over a period of thirty-two years of service, is a property right and that the company is liable in damages for taking it, and the plaintiff's action in assuming charge of the route was equivalent to a forfeiture thereof which the law abhors.

The defendant concedes that plaintiff had the right to terminate their relations at any time. He and one of his carriers admitted on the witness stand that for two weeks prior to the time of his surrendering the route, they solicited every subscriber that they thought they could influence in order to get their subscription for plaintiff's competitor, whose employment they were about to enter. We are quite certain that the defendant did everything in his power to destroy the route, as far as plaintiff was concerned, and to transfer it to the other newspaper company. As a result of his arbitrary and unwarranted action in failing to furnish the necessary route list, or anything equivalent thereto, or to comply with the custom of taking the new carrier over the route in order that he could familiarize himself therewith, it was necessary for the company to put sixteen men in the territory and deliver newspapers to everybody's home therein, in order to make certain that its papers were being delivered to its subscribers. This had to be done until plaintiff could make the necessary check of its faulty index and a house to house investigation to find out who were subscribers and who were not, in order to preserve the route. It is estimated that defendant's action caused plaintiff an additional expense of over $1,000, which would not have been entailed had the defendant complied with the usual and customary practice of turning in the route list, showing the new carrier the practical or easy way to deliver the papers and then wait thirty days in order to have the subscribers' lists verified when he would receive $1 for each subscriber. In other words, the purpose of the company in paying $1 for each verified subscriber was to preserve their business and good will in that territory or on that route. Here the defendant sought to destroy in advance the very thing that he expected to be paid for and succeeded to the extent of alienating 321 subscribers. If the company was able to maintain a substantial or large part of the route for itself, it did so, not because the defendant turned it over to it at the termination of his services, but in spite of his efforts to destroy it.

The defendant has referred us to the case of Harlow v. Oregonian Pub. Co., 53 Or. 272, 100 P. 7, as being in point in his favor. We do not believe that case apposite, because there the publishing company had sold the route to the carrier under a written contract, which gave him exclusive rights in that territory. The contract contained a provision for arbitration of any difficulty arising between the parties. Upon the carrier leaving the publisher's employment the company was willing to arbitrate the amount that it claimed he owed for newspapers furnished, but refused to arbitrate the question of whether or not the carrier had any property rights in the newspaper route. Here, the plaintiff never sold the defendant the route, but he purchased it from another carrier. Furthermore, his actions were equivalent to refusing to turn over the route to the plaintiff and entering into a competitive contest over it in trying to maintain it for himself.

For the reasons assigned the judgment appealed from is affirmed.

Affirmed.