Argued March 27, affirmed June 26, 1923.

## ZOHAROPULOS *v.* HAMILTON ET AL.

### (216 Pac. 184.)

**Contracts—May be Part Writing and Part Oral Where Writing not Required by Law.**

1. It is competent for an agreement to be partly in writing and partly in parol where the law does not require a writing.

**Contracts—Agreement by Representative of Banks Held His Individual Contract.**

2. Contract by the representative of banks reciting that "I, W., do hereby agree," etc., and signed by said W. with the added words, "Banker of the First National Bank," etc., was not the agreement of the banks, but of W. alone.

**Evidence—Parol Evidence Affecting Contract Admissible as Against Third Party.**

3. Where an agreement was between the representative of banks individually and another, parol evidence affecting the agreement was admissible against the banks, they standing only as third parties in relation thereto.

**Chattel Mortgages—Delivery Matter of Intention as Disclosed by All the Circumstances.**

4. The delivery of chattel mortgages and notes, whether final and absolute or conditional, was largely a matter of intention as disclosed by all the circumstances.

**Escrows—Instruments Held Delivered and Recorded in Violation of an Escrow Agreement.**

5. Where J., in contemplation of forming a dairy partnership with H., who was indebted to banks, had H.'s dairy herd, which was mortgaged to the banks, transferred to him, advancing some money for H., and executing notes and chattel mortgages on his herd and equipment to the banks, evidence *held* to show that such money and instruments were turned over to the bank's representative under an oral escrow agreement, and were delivered to and recorded by the banks in violation of such escrow agreement whereby delivery was conditioned on tuberculin tests of H.'s herd.

**Escrows—Wrongful Delivery Avoids Instruments.**

6. The delivery of any instrument contrary to the conditions of the escrow under which it is held is void, and confers no right upon the recipient.

From Columbia: J. A. EAKIN, Judge.

Department 1.

'AFFIRMED.

For First National Bank of Scappose and First National Bank of Linnton, there was a brief over the name of *Messrs. Ridgway & Johnson,* with an oral argument by *Mr. Albert B. Ridgway.*

For Gust Zoharopulos, there was a brief over the names of *Mr. J. Frank Shelton, Mr. G. E. Hamaker* and *Mr. Glen R. Metsker.*

For J. D. Hamilton there was a brief and oral argument by *Mr. Wilbur Henderson.*

For Swift & Company there was a brief over the names of *Messrs. Carey & Kerr* and *Mr. Omar C. Spencer.*

For Oregon Willard Commission Company, there was a brief and oral argument by *Mr. George Arthur Brown.*

BURNETT, J.—By agreement of counsel and parties these three suits were heard together, both in, the Circuit Court and in this court. They arise out of the following circumstances:

The First National Bank of Scappoose, which we will call Scappoose Bank for convenience and the First National Bank of Linnton to be called Linnton Bank, were owned largely by the same stockholders and operated together in the transactions here involved. E. E. Wist was the cashier of the Scappoose Bank and its general managing agent. He represented not only the Scappoose Bank but also the Linnton Bank in all those transactions. For convenience of pronunciation, Gust Zoharopulos will be called the Greek. He was a dairyman residing upon

leased premises near St. Johns. His tenure was to expire about February 20, 1921. He owned a herd of dairy cows and other livestock together with various farm implements, milk machines, feed, and other personal property useful in conducting his business of dairyman, all on the place near St. Johns. J. D. Hamilton was likewise a dairyman living on property near Scappoose, which he had leased from one Pomeroy for a term of years. Hamilton was indebted to the two banks and had given a chattel mortgage on his herd of dairy cattle and other property to secure the indebtedness amounting, at the time of the transactions involved in these suits, to $6,256.90. C. K. Mageske was a real estate broker with offices in Portland.

As the Greek's lease was about to expire, he employed Mageske to find a place for him where he could continue his dairy business and Mageske had discovered Hamilton who was desirous of either selling out his business or taking in a partner with additional capital. Hamilton was in arrears of rent and of payments due on his obligations to the banks. After considerable fruitless negotiation, the transaction appears by the testimony to have been dropped so far as carried on between Hamilton and the Greek through the efforts of Mageske. This situation came to the knowledge of Wist who thereupon urged Mageske to renew his efforts and bring the deal to a successful conclusion, involving the transfer of Hamilton's interests and property to the Greek who would assume the indebtedness of Hamilton and secure the same by a chattel mortgage upon his own personal property and that which he would acquire from Hamilton. The Greek maintained that his own cattle were free from tuberculosis as shown by official tests, and demanded that the Hamilton cattle should be tested

and their freedom from that disease demonstrated before he would conclude the purchase. At length, on February 14, 1921, the Greek, attended by a friend of his nationality named Tom Givas, as interpreter, Mageske, and Wist, the latter representing the two banks, together with Pomeroy, the landlord, met in the latter's office in Portland. Two chattel mortgages were prepared, one to the two banks covering and securing two separate notes to the extent to which they each were allowed to make a single loan, and the other for $550 to Hamilton, the sum of the three notes being the purchase price to be paid by the Greek for the property he acquired from Hamilton, in addition to $500 earnest money advanced by the Greek.

There is some dispute in the testimony about whether the mortgages and notes were executed in Pomeroy's office on the evening of February 14, or at the Scappoose Bank during the following day. The weight of the testimony however, is to the effect that they were signed by the Greek the evening of the 14th and acknowledged by him at Scappoose the following day. The bone of contention between the parties is a writing introduced in evidence marked "Plaintiff's Exhibit A" partly typewritten and partly in pen and ink. As typewritten it reads as follows:

"Portland, Oregon.
"Feb. 14, 1921

"I, E. E. Wist, Banker of First National Bank of Scappoose and Linnton do hereby agree not to turn over to J. D. Hamilton any of the money derived from the sale of live-stock and equipment until his stock is tested by state veterinary without charge of same to Gust Zahrapulos."

The Greek contends that it was submitted by Wist to him in its typewritten form as above set forth and that he and his friend Givas objected to it and that

Mageske, in the presence of Wist and before signature, added pen and ink writing so as to make the instrument read thus:

"Portland, Oregon
"Feb. 14, 1921

"I, E. E. Wist, Banker of First National Bank of Scappoose and Linnton do hereby agree not to turn over to J. D. Hamilton *or others,* any of the money derived from the sale of live-stock and equipment until his stock is tested by state veterinary without charge of same to Gust Zahrapulos, *and the mortgage and money to be held by the above bank in ashkroft. this is a part of contract dated Feb. 11th 1921, & signed J. D. Hamilton.*"

For greater clarity, we italicize the manuscript amendment.

Wist contends on behalf of the banks that the only addition to the typewritten instrument was made by himself before signing, and consisted of these words written after 'Zahrapulos'; "Except a Mortgage to the Banks." The Greek maintains that this amendment was written by Wist on both typewritten copies but was erased by Mageske in the presence of Wist on Exhibit "A" and the pen and ink manuscript put there before signing. This is denied by the defendants.

The Hamilton cattle were inspected and found to be infected with tuberculosis. Eighteen head were slaughtered by the state authorities and the remainder of the herd was sequestered and put into quarantine. Zoharopulos thereupon demanded the return of his notes and mortgages, which was refused by the bank which had meanwhile put them on record. At this juncture the Greek began suit to cancel the notes and mortgages and for return to him of $500 he had advanced as earnest money. The banks began suit to foreclose the mortgage given to secure the notes of

the Greek to the two banks and the Scappoose Bank to which had been assigned the $550-dollar note and mortgage running to Hamilton sued to foreclose that obligation. The decree of the Circuit Court was in favor of the Greek and against the banks to the effect that the notes and mortgages be canceled and satisfied of record and that the Greek recover from the banks $500 and interest together with costs and disbursements. The Circuit Court also dismissed the suits to foreclose the mortgages and the banks and Wist appealed jointly although there was no decree against Wist.

The Greek maintains that the notes and mortgages were executed and put into the hands of Wist in escrow, not to be delivered or to have any effect unless it should be disclosed by the veterinarian test that the Hamilton cattle were free from tuberculosis and that if the cattle were discovered to be thus infected, the money, notes and mortgages should be returned to him. On the part of the banks, the contention is that the escrow agreement was evidenced exclusively by Exhibit "A" in its original form with the pencil clause, "Except a mortgage to the banks" added; and, without mincing words, that the pen and ink addition to the instrument as offered by the plaintiff as Plaintiff's Exhibit "A" was a forgery. The contest, as waged on the witness-stand, centers principally about this question of whether the instrument in its form of Plaintiff's Exhibit "A" is genuine or forged. Mageske and the Greek directly contend that the instrument is genuine. Wist denies it and affirms that as signed by him, the only addition was the pencil memoranda mentioned. Other witnesses on both sides narrate circumstances in support of both contentions.

We do not find it necessary to decide whether the instrument is genuine or forged. The banks maintain that it was as in form as stated by Wist and that it is conclusive upon the Greek at this juncture and cannot be disputed by him, with the result that the agreement was not violated by the recording of the mortgages and the retention of the notes.

1. In any view of the case, the instrument, in whatever form, was the individual agreement of Wist. Neither of the banks is a party to it. Viewing it from the standpoint of the banks, it does not purport to affect anything except the money derived from the sale of livestock and equipment. This might well apply to $500 in money which all agree had been advanced by the Greek as earnest money. Nothing being said in the Wist edition of Exhibit "A" as to the custody or delivery of the notes and mortgages, that part of the transaction may well be rested in parol. It is quite competent for an agreement to be partly in writing and partly in parol, where a written memorial is not required by law: 5 Wigmore on Evidence (2 ed.), § 2430.

2. That plaintiff's Exhibit "A" was not the agreement of the banks is plain from its phraseology, opening as it does with the personal pronoun, "I" which cannot be held applicable to the banks. The addition after the name "Wist" of "Banker of First National Bank of Scappoose and Linnton" adds nothing to the terms or efficiency of the instrument, any more than if he had said "Farmer" or "Carpenter." It is signed, not by the banks, but by E. E. Wist and that too, without the addition of any title or office or agency. In *Dennison* v. *Story,* 1 Or. 272, the precept is thus laid down:

"It is a general rule of law, that one who acts for and on behalf of another, as agent, or in any dele-

gated capacity, must transact his business in the name of his principal."

So here, if Exhibit "A" in whatever form, was intended to bind or protect the banks, it should have been executed in their names. That this was the obligation of Wist alone and that the addition of "Banker," etc. does not alter his liability or make it the contract of another is taught by *Guthrie* v. *Imbrie,* 12 Or. 182 (6 Pac. 664, 53 Am. Rep. 331) ; *Ogden Ry. Co.* v. *Wright,* 31 Or. 150 (49 Pac. 975) ; *MacLeod* v. *Despain,* 49 Or. 536 (90 Pac. 492, 92 Pac. 1088, 124 Am. St. Rep. 1066, 19 L. R. A. (N. S.) 276) ; *Matthews* v. *Dubuque M. Co.,* 87 Iowa, 246 (54 N. W. 225, 19 L. R. A. 676).

3. In the contest between the banks and the Greek over the terms of the escrow, therefore, we have only to consider the effect of an agreement made by a third party or, at best, between the Greek and that third party. Even if we consider it as an agreement between Wist and the Greek, that construction does not conclude him, as between himself and the banks, from proving by parol what the escrow agreement actually was: *Pac. Biscuit Co.* v. *Dugger,* 42 Or. 513 (70 Pac. 523) ; *Bagley Co.* v. *International Hdw. Co.,* 99 Or. 519 (195 Pac. 348). In spite of Exhibit "A" therefore, whatever its actual form, we are at liberty to consider the oral testimony about what the agreement really was as to the execution and delivery of the instruments in question.

Some of the testimony on that subject is here set out:

Speaking of the notes and mortgages at the trial, Mageske testified as a witness and answered questions as follows:

"Q. You say they were not to have them signed the night before but Wist insisted on it?

"A. Yes, Mr. Wist insisted on it.

"Q. Why were they not to have been signed?

"A. Because the cows were to be tested before the final closing up.

"Q. Was that the agreement?

"A. That was the agreement but then after awhile the agreement was reached to put them in escrow, have it signed and put in escrow.

"Q. Have what signed and put in escrow?

"A. The mortgages and the notes and then place in my bank and Mr. Wist objected. Said he would have it in his bank.

"Q. He objected to placing them in escrow?

"A. In my bank, yes, as he was dealing and he wanted to have them in his bank.

"Q. He wanted to have them in his bank, hold them in escrow?

"A. Yes.

"Q. Just tell the court all that was said in regard to that, the statements he made.

"A. Well, as near as I can remember * * then finally Mr. Wist informed me that Hamilton was a crook and had nothing to do with it and that he was the man to deal with; and then finally I agreed that it should go in his bank but with an escrow agreement which was done the following day."

Mrs. Doris C. Hamilton testified about Wist and Mageske stopping at the residence of herself and her husband on the Pomeroy place on the evening of February 14 on their way from Portland to Scappoose after the meeting in Pomeroy's office, and answered questions as follows:

"Q. What, if anything, did Mr. Wist say at that time in your presence to Mr. Hamilton in your hearing?

"A. Why, he told Mr. Hamilton that the deal was closed and that he had the papers and was to hold them and not pay out any money until after the cows were inspected for tuberculosis.

"Q. Who said that?

"A. Mr. Wist. * *

108 Or.—14

"Q. He said that the deal was closed?

"A. Yes.

"Q. He said that he wished us to hold the papers and pay out no money until after the cows were tested?

"A. That is what he said to us; to hold the papers and not to pay out any money until the cows were tested.

"Q. You heard him say that?

"A. Yes, sir, I heard him say that."

On cross-examination she testified as follows:

"Q. As a matter of fact, Mrs. Hamilton, didn't Mr. Wist tell your husband that he was to pay no money to Mr. Hamilton until the cows were tested?

"A. He didn't say whether he was to pay it to anybody. He just said he was to hold the papers and not pay any money until after the cows were tested * * ."

After relating that he was present as an interpreter for Zoharopulos on February 14th in Pomeroy's office when the notes and mortgages were signed, Tom Givas testified in answer to interrogatories as follows:

"Q. What took place while you were there? What was said?

"A. After I was there reading I protested again and I say to Mr. Zoharopulos, 'Don't sign that because it ain't good. They are not going to have any kind of agreement to test the cows first.' So then I have a talk with Mr. Mageske and ask Mr. Mageske—I had a quarrel with Mr. Mageske and ask him if that is the way he protects his clients and Mr. Mageske told me that he got a gentlemen's agreement with Mr. Wist, is going to have escrow agreement drawn next day down in Scappoose. I asked Mr. Wist if it is so, and he say 'Yes, and we going to call a doctor to examine the cows tomorrow * * .' Finally I told Mr. Zoharopulos in case the gentleman agreement you depend on Mr. Mageske and Mr. Wist is going ahead and see, said he is going up tomorrow

and sign escrow agreement down there and he went ahead and had him sign it.

"Q. Mr. Wist was there present?

"A. He was present.

"Q. Did he hear all this conversation that you told about?

"A. Yes.

"Q. And you asked him if it was true that he was going to draw an escrow agreement?

"A. Yes sir—yes, sir.

"Q. Was there anything said about what was going to be done with the papers, notes and mortgages pending the tuberculosis test of the cattle?

"A. I was the one who protested on that and I told Mr. Zoharopulos to not sign before the cows be tested so you be sure—sure what you sign and finally I talk with Mr. Mageske and I talk with Mr. Wist and so, well, we have done already agreements, we drawing escrow agreement tomorrow down at Scappoose and of course, was gentleman agreement. I told Mr. Zoharopules 'You depend on Mr. Wist's word and Mr. Mageske's word, gentlemen's word and go ahead tomorrow and have escrow agreement signed.' "

J. D. Hamilton testified about the call Wist and Mageske made at his home on the Pomeroy place the evening of February 14th on their way to Scappoose from Portland in answer to questions as follows:

"Q. What was said?

"A. Well, they came in and knocked—we were— I went to the door and Mr. Wist came in and came up on the porch and he says that the deal—they had everything fixed up—and the deal was closed and that they would be down tomorrow to finish up the papers down at the bank and he says, 'Understand, there is no money to be paid to anybody or no papers to be delivered until after these cows are tested,' which had been agreed with Gust Zoharopulos. When he first came to the ranch when Mageske first brought him there, he told me plainly that 'I can't handle the thing unless your cows are clean.' They had to be

tested and, well I knew they had to be because I know they won't allow milk to be delivered in Portland without—from untested cows only to these creameries where they put it through this process.

"Q. Zoharopulos insisted on that from the first?

"A. Zoharopulos insisted on that from the first day I met Gust. He said, 'These cows had to be tested.' I said, 'All right Gust.' I says, 'All right if we—if you make the deal why we will test the cows. If they are good, all right. If they ain't, you don't have to take them.'

"Q. You told him that?

"A. I told him that. I told Mageske that and I told Wist that. I told the whole bunch.

"Q. On the night of February 14, Wist stopped at your house and told you what you have just related?

"A. Yes. Told me the papers—He said the deal was closed and that the papers had been signed and the papers was to be held and no papers to be delivered until after this test was made."

Testifying as a witness for the defendants, Wist tells about the call made at Hamilton's on the evening of February 14th as follows:

"We stopped there at Hamilton's. I told Mr. Hamilton that the deal had been closed and that I had the papers and for him to come down to the bank the next morning and he said he could not come down very early as he really had no way of coming down. He hadn't a license for his 1921—for his car and I told him I had all the papers and that there was no money to be paid to Mr. Hamilton until after the cows had been tested and Mr. Mageske and some of us had been talking just what would be the best available way of having the veterinarian test the cattle and I told him that he could have the State veterinarian but I told him it would take longer probably to get him. I knew Mr. Mack—Dr. Mack and that as the milk was going in the city probably it would be better, probably get quicker service from the city than he would from the state and Mr. Mageske suggested to Mr. Hamilton then that he call up Dr.

Mack the next morning and have him come down and test the cattle.''

4. That the matter was to be affected by the tuberculosis test of the Hamilton cattle is patent throughout the case, even by the testimony of Wist himself. The banks contented themselves with the position that Exhibit ''A'' in the form contended for by Wist concludes the Greek. Wist does not directly contradict Hamilton or Mrs. Hamilton, or Givas or the Greek, himself, or Mageske in their statements that the conclusion of the entire transaction depended upon the Hamilton cattle being free from tuberculosis as disclosed by a veterinarian test. Wist admits the visit at Hamilton's in company with Mageske. He differs from the others only in what was said there and does not directly dispute their statements. The Greek had had his own cattle tested and knew they were free from the disease. It is not likely that he would buy the Hamilton cattle and incur heavy indebtedness on that account without knowing that they also were uncontaminated. On the other hand, a circumstance strongly affecting the weight of Wist's testimony is his financial interest in the matter. As stated, the Hamilton herd was condemned and most of it killed, thus depreciating very heavily the original security of the banks for the Hamilton indebtedness. If Wist could succeed in obtaining new and additional security for that indebtedness by placing a mortgage on the Greek's cattle, it would redound to the advantage of the banks which he represents. He stands practically alone in the testimony for the banks, aside from Exhibit ''A.'' The banks rely upon that instrument as described in Wist's testimony, as their sheet anchor, and deny the right of the Greek to dispute its terms. As before stated however, the door is open to him to show by parol the real agreement respecting

the escrow. We cannot find from the testimony that the Greek intended to make a final and absolute delivery of the instruments he had signed when he placed them in the hands of Wist. Delivery is largely a matter of intention as disclosed by all the surrounding circumstances: *Norton* v. *Norton,* 105 Or. 651 (209 Pac. 1050).

5, 6. A careful reading of the testimony convinces us that the contention of the Greek is right and that the notes and the mortgages were put into the custody of the banks and recorded in violation of the terms of the escrow. The delivery of any instrument contrary to the conditions of the escrow under which it is held is void and confers no right upon the recipient: *Allen* v. *Ayer,* 26 Or. 589 (39 Pac. 1); *Tyler* v. *Cate,* 29 Or. 515 (45 Pac. 800); *Telschow* v. *Quiggle,* 74 Or. 105 (145 Pac. 11).

We conclude then that the notes and mortgages signed by the Greek are void and of no effect and should be canceled. The result is that the suits to foreclose those same mortgages should be dismissed and that the decrees of the circuit court should in all things be affirmed in all of the three suits.

AFFIRMED.

McBRIDE, C. J., and HARRIS and RAND, JJ., concur.